**Mrs. Clifford Raymond SCHLICHTER,**

v.

**PORT ARTHUR TOWING COMPANY.**

**No. 18505.**

United States Court of Appeals
Fifth Circuit.

April 5, 1961.

James H. Drury, Frank J. Varela, New Orleans, La., for appellant.

George W. Healy, III, New Orleans, La., for appellee.

Before JONES and BROWN, Circuit Judges, and CARSWELL, District Judge.

JOHN R. BROWN, Circuit Judge.

This appeal presents the question whether the District Court was correct in granting an instructed verdict in favor of a defendant vessel owner in a Jones Act, 46 U.S.C.A. § 688, claim for damages due to the negligent death of a seaman. We affirm.

The vessel is the small river pusher type towboat Ann Lee. She is 55 feet in length. Her stern is square with a wooden grating type decking over the extreme after end. This raised portion is about a foot above the level of the steel deck. This gives the appearance of a platform four or five feet in length fore and aft and running athwart the stern. The steel

deck is flat and furnishes a passageway across the stern immediately forward of this raised platform. It also furnishes a passageway approximately three feet wide along the port and starboard side of the deckhouse. The freeboard was in the neighborhood of two feet. Along each side of the tug are permanent steel stanchion posts to which a chain guard rail, about waist high, is fastened. From the after-most stanchion the chain guard rail leads downward to the grating at the after end. The chain guard in this area is about knee-high.

In the housing on the main deck were crew's quarters, engine space, and the galley-mess room. Access to these spaces was through conventional doors on each side. The galley door (on each side) was but four or five feet from the after end of the deck housing and not over 15 feet from the stern. The wheelhouse is on the next deck above. A ladder leads up to the wheelhouse deck. This ladder is immediately forward of the forward end of the deckhouse.

The drowning took place late on the night of February 23, 1960. Schlichter, the decedent, was a member of the crew serving as engineer. The tug was then moored to the dock of a chemical company in the Ouachita River at Sterlington, Louisiana. The tug had been there several days. After mooring the tug at the dock, the captain and the remainder of the crew went to their homes for a periodic shore leave. Schlichter desired to remain aboard and this was permitted. Although the evidence does not categorically spell it out, Schlichter as the sole person aboard had a responsibility for the safekeeping of the vessel, or at least her removable equipment. Consequently, he had keys to all of the access doors. While there was a port engineer stationed at nearby Sterlington, the uncontradicted evidence showed that his responsibility was only as an engine maintenance man. It was not his duty to see that during Schlichter's stay lights were left on, doorways left open, or lifesaving gear kept available. These things were left entirely up to Schlichter.

On the afternoon of February 23, Schlichter had entertained two of his friends, Redden and Slade, aboard the tug. Each had worked for the Towing Company in the past but neither was then in its employ. Whether their presence or activity that afternoon was or was not permissible need not concern us since nothing then done caused harm. Likewise it does not matter how much drinking went on aboard the ship. For after he had all of the doors opening into the deckhouse locked, Schlichter and his two friends left the tug about 6:00 p. m. and went ashore where Slade and Schlichter engaged in some rather concentrated drinking. For example, Slade, the sole surviving witness and produced by the plaintiff, acknowledged that Schlichter had purchased 18 bottles of beer and the three of them had obtained two pints and one-fifth of Vodka. One pint was completely consumed, largely by Slade and Schlichter. The fifth was opened for one drink. How much beer each consumed was not directly shown, but it was substantial as several irrefutable factors made manifest. Slade's categorical acknowledgment on the witness stand that Schlichter was intoxicated may be disregarded in view of his prior inconsistent statement given at the Coroner's inquest. But in stating the facts on which he based his opinion of intoxication, and whether, as one sign, Schlichter's speech was blurred or fuzzy, his answer showed both the extent of the drinking and his lack of dependable observation or recollection as a witness. It also appeared that when he stated to the Coroner that Schlichter was not drunk, he was using that term as he understood it and on that standard the man was not drunk so long as he was able to move as Schlichter clearly was. But intoxication was not left to the imponderables based upon the observation and estimates of witnesses using elusive terms which are unavoidably so inexact. The body was removed from the river the next day and an autopsy was performed for the Parish Coroner. It is uncontradicted that the chemical examination revealed the pres-

ence of 0.31% Ethyl alcohol in the blood. After all possible adjustments were made for changes due to post-death metabolism (the effect of which is to reduce alcohol in the blood) or possible production of body alcohol (which could account for a maximum of 0.05%), the reading was not less than 0.30%. A pathologist and toxicologist, whose qualifications were conceded, as an expert witness then compared this with medical studies made concerning intoxication of an average person. Whereas Schlichter had a 0.30% plus reading, it is considered, medically and legally, that a person with a reading in excess of 0.15% is too far under the influence of alcohol to permit driving an automobile. This figure is generally accepted as proof of driving while intoxicated. In the other direction, a reading of 0.40% produces a coma colloquially described as passing out. After that, an additional 0.10% is critical as death from acute alcoholism generally occurs at 0.50%. The intensity of the state of intoxication is reflected by the amount of alcohol required to produce this percentage. The reading of 0.31% would have required 15 ounces of Vodka (at 80 proof) or 22 bottles of beer.

A more detailed description of the occurrence at the time of the drowning has not been prefaced by this review as a basis for any conclusion that, as a matter of law, death was due either partly or wholly to the seaman's intoxication. Intoxication does not work a forfeiture since that generally merely mitigates damages. Bently v. Albatross S. S. Co., 3 Cir., 1953, 203 F.2d 270, 272, 1953 AMC 645; McDonough v. Buckeye S. S. Co., N.D.Ohio, 1951, 103 F.Supp. 473, 1951 AMC 2042, affirmed 200 F.2d 558, 1953 AMC 343. Of course, the result is different if the seaman's negligent intoxication is the sole cause of the injuries. Donovan v. Esso Shipping Co., 3 Cir., 1958, 259 F.2d 65, 1958 AMC 2096. But this was a fact against which, in the peculiar circumstances of this record, the shipowner's duty and whether any breaches of such duty contributed to cause death is to be measured.

The three—Schlichter, Redden and Slade, came back late that night. It was, of course, dark. No lights were burning on the tug but the lights from the terminal were presumably adequate in their judgment to permit them to go aboard. To go from the terminal wooden catwalk running out from the shore down onto the tug, they had to climb down a nearly vertical ladder some 15 or so feet in height. The men boarded the tug near the bow and made their way back to the stern by the passageway on the starboard side. While the tug was equipped with adequate toilet facilities, these were located in the deckhouse which had been locked by Schlichter when he went ashore earlier that evening. Consequently it was Schlichter's purpose to relieve himself while standing on the after deck near the starboard side. No survivor saw Schlichter fall. How he fell or what caused him to fall is not known. Slade, the only survivor, had his back to Schlichter and heard the splash. Slade thereafter never saw Schlichter. Almost instantaneously Redden jumped in the water presumably to try to rescue Schlichter. Slade did see Redden's head come to the surface one time. In order to obtain a life jacket to throw toward Redden, he attempted to get in the galley, but the door was locked. He then ran forward and up to the wheelhouse which was still open, obtained a life jacket and ran back to the stern. After returning to the stern, he never saw Redden, Schlichter, or any sign of them. It was not until sometime the next day that Schlichter's body was recovered from the river.

This was no unexplained disappearance under circumstances suggesting unsafe working conditions as in Schulz v. Pennsylvania R. Co., 1956, 350 U.S. 523, 76 S.Ct. 608, 100 L.Ed. 668, 1956 AMC 737. Here Schlichter's position on the stern was reasonably fixed. The conditions then existing were known and on the trial were described without any equivocation. Slade affirmed categorically that the deck was free from grease or any other slippery substance. There was

nothing which would cause Schlichter to lose his balance, slip or fall. A slight criticism is made of the height of the chain guard because at that point it ran down at an angle from waist-high to knee-high. But there was no evidence that the operation of the towboat in its ordinary activities would reasonably have permitted any other type of railing or guard. Whether the lights on the tug were on is not clear. It was uncontradicted, however, that at the corner of the after end of the deckhouse there was a flood-type light which would have lighted up the entire after end. If that light was not on, it was because Schlichter had not turned it on. Smith v. Reinauer Oil Transport, Inc., 1 Cir., 1958, 256 F.2d 646, 650, 1958 AMC 1875.

Liability cannot, therefore, rest upon the initial cause of Schlichter's falling into the water. If liability exists, it turns upon the inadequacy or unavailability of facilities for rescue.

In this record this comes down to the sufficiency of the lifesaving gear on board and whether, if sufficient in itself, it was readily accessible in the event of emergency. Here again the facts are in very little, if any, dispute. Aboard the towboat were not less than a dozen life jackets. But there were no ring life buoys. On behalf of Schlichter it was claimed that life rings ought to have been furnished and in any case the presence of life jackets aboard affords no legal justification since they were locked up and unavailable.

■ As to ring life buoys the plaintiff was content with whatever evidence could be obtained from the tug owner called as an adverse witness under F.R.Civ.P. 43 (b), 28 U.S.C.A. As a former ship master with unlimited governmental license for any tonnage and any waters, he certainly had the qualifications of an expert. True, the jury because of his interest and

the nature of expert testimony need not have credited it. But once discounted, nothing remains to supplant it. As a witness he stated that life rings are required and hence customarily found aboard ocean-going vessels and large tugs exceeding 65 feet in length. They were not, however, customarily found, nor were they required under Coast Guard regulations for vessels (not carrying passengers for hire) under 65 feet in length. In this respect he was borne out by the formal regulations promulgated by the Coast Guard which were introduced into evidence.[1]

■ Of course compliance with the customs and practices of an industry is not in itself due care. Troupe v. Chicago, Duluth, & Georgian Bay Transit Co., 2 Cir., 1956, 234 F.2d 253, 260, 1956 AMC 1367; Universe Tankships, Inc. v. Pyrate Tank Cleaners, Inc., D.C.S.D.N.Y.1957, 152 F.Supp. 903, 918, 1957 AMC 1436; 38 Am.Jur. Negligence § 34.

■ Similarly, governmental regulations do not necessarily measure the scope of duty. Occasionally they reflect merely a minimum so that noncompliance leads to imposition of civil responsibility almost as a matter of course. In some situations either notions of ordinary prudence implicit in the concept of due care or the exacting standards of seaworthiness call for an owner to supply more than the bare facility exacted by statutory or regulatory law. Prosser, The Law of Torts § 34 at 163–64 (2 ed. 1955); The T. J. Hooper, 2 Cir., 1932, 60 F.2d 737, 1932 AMC 1175. But that depends on circumstances and circumstances depend on evidence. There was no effort to disprove the custom and practice of vessels under 65 feet in length not to carry life rings. Nor was there any effort to prove by competent witnesses those facts from which a jury—untrained in the operation of vessels—could reason-

1. 46 CFR § 25.25–10(b) (2). "Motorboats of Class 3 not carrying passengers for hire shall carry an approved life preserver or ring life buoy for each person on board."

Under 46 CFR § 25.10–17 the Ann Lee came within the definition:
"Class 3—Any motorboat 40 feet or over and not more than 65 feet in length." Issued pursuant to 46 U.S.C.A. § 526p.

ably infer that availability of ring life buoys in contrast to life jackets was reasonably necessary.

In addition to this, as we shall later discuss, with the tug in the idle status and only one crew member living aboard her, there was a real problem of loss of valuable ship equipment from pilferage. The consideration that led to the locking of all of the access doors on Schlichter's departure with his friends that evening would have permitted like protection to ring life buoys.

That brings us to the availability of life jackets. The Coast Guard regulations for obvious reasons do not allow the shipowner to rest on the mere supply of lifesaving gear. The gear must be readily available for use in emergencies that strike without much warning.[2]

Here the case takes on a new peculiarity that is inescapably tied directly to Schlichter. The life jackets were not, as the regulation literally requires, readily available at the scene. But why was that so? It was because the very person (or his successors) now complaining of lack of availability took the affirmative action which brought about this condition. The doors had been locked by Schlichter—or one of his cohorts at his direction. Schlichter had the key. He was management's sole representative to determine when and what doors were to be locked. For what appears to have been good reasons—certainly plausible ones— he decided that all access doors on the main deck should be secured.

Unwittingly he may have sealed his own fate in that decision. Since he alone could make these decisions, and he alone took the decisive action, neither he nor those who claim through him can assert that the vessel owner had a duty to have someone there to supervise him in the performance of the limited task which fell to his lot as the sole occupant of the tug under the permissive arrangement allowed by the owner. Smith v. Reinauer Oil Transport, Inc., 1 Cir., 1958, 256 F.2d 646, 651, 1958 AMC 1875.

This is not to make the owner's obligation to the one in charge any less exacting, or somehow to charge that person with the full, not pro rata consequences, of any mistaken judgment as may have been the case in Walker v. Lykes Bros. Steamship Co., 2 Cir., 1952, 193 F.2d 772, 1952 AMC 269.[3] Here on uncontradicted facts there was an ample supply of life jackets. Located where they were, in the galley just a few feet from the scene with more of them stored in the crew's quarters a few feet beyond, they would have been immediately—and hence readily—available had the doors not been locked. As to this claim Schlichter and those suing through him cannot say—in the absence of proof that he had positive orders overriding his freedom of judgment as to locking the doors—that it was the shipowner's negligence which resulted in these life jackets being unavailable.

In addition to these insuperable obstacles nowhere overcome by any evidence, there is a total lack of any evidence to show that under these unique conditions, availability of life jackets, or ring life buoys, in the galley messroom or elsewhere would have saved Schlichter's life. Of course the standard is now well known and has been variously stated. "Under this statute the test of a jury case is simply whether the proofs justify with reason the conclusion

2. The Coast Guard Regulations, see note 1, supra, provide:
   46 CFR § 25.25-15(a). "The life saving equipment on all vessels shall be so placed as to be readily accessible."

3. This case and the so-called "primary duty rule" has been subject to considerable criticism, see Boat Dagny, Inc. v. Todd, 1 Cir., 1955, 224 F.2d 208, 1955 AMC 2083. which in turn rests largely upon the analysis made by this Court in Louisiana & Arkansas R. Co. v. Johnson, 5 Cir., 1954, 214 F.2d 290, and its application has been severely limited, Mason v. Lynch Bros. Co., 1956, 4 Cir., 228 F.2d 709, 1956 AMC 394; Spero v. Steamship Argodon, D.C.E.D.Va., 1957, 150 F.Supp. 1, 1957, AMC 1056. In its own circuit the Walker case has been expressly distinguished, Dixon v. United States, 2 Cir., 1955, 219 F.2d 210.

that employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought." Rogers v. Missouri Pacific Ry. Co., 1957, 352 U.S. 500, 506, 77 S.Ct. 443, 448, 1 L.Ed.2d 493.[4]

But to satisfy this there must be some evidence. Slade was standing within a few feet of Schlichter when the latter went into the water. Though his attention was immediately directed to the splash, Slade never saw Schlichter thereafter. Perhaps Redden did, in any event, Redden jumped in. Slade never heard either of them cry out. Where Schlichter was, or where he might have been seen, is not shown in any way. For a life preserver to be effective, there must be a person within its reach or at least thought to be within the specific area where the preserver is to be thrown. In this situation it would be sheer fantasy to say now that had one or two or three jackets or ring life buoys been available at the after end of the deckhouse, anyone would have been rescued. To this complete lack of any evidence there must be added the peculiar problem of this record. Whether there is a reasonable likelihood that Schlichter would have been saved cannot avoid taking into account the undisputed evidence about the substantial, if not advanced, state of his inebriation as it bore on his capacity for self help or survival.

■ In the complaint there was a second count based upon the Louisiana Death Statutes, LSA–C.C. art. 2315, and the general maritime law for unseaworthiness. The former could not apply as to a seaman in view of the Jones Act. Lindgren v. United States, 1930, 281 U.S. 38, 50 S.Ct. 207, 74 L.Ed. 686, 1930 AMC 399. Since every consideration discussed by us regarding any asserted negligence proximately causing or contributing to cause death would have equal application to any assumed breach of the duty to furnish a seaworthy vessel under Mitchell v. Trawler Racer, Inc., 1960, 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941, 1960 AMC 1503, we avoid, as did the Supreme Court, the necessity of determining whether there can now be any death action under that concept. Kernan v. American Dredging Co., 1958, 355 U.S. 426, 429–430, 78 S.Ct. 394, 2 L.Ed.2d 382, 1958 AMC 251.

■ The unique circumstances of this record may be severely compressed. In every respect all that occurred rested directly on Schlichter. He was in the condition he was in voluntarily. It was because of his action in locking the doors that toilet facilities were closed. Cf. Ringhiser v. Chesapeake & Ohio R. Co., 1957, 354 U.S. 901, 77 S.Ct. 1093, 1 L.Ed. 2d 1268. He made the choice to go to the after deck instead of unlocking the door. If lights were inadequate, it was he who had the keys to permit them being turned on. Lifesaving gear was locked up and unavailable because he had locked the doors. Toilets, lights, lifesaving gear were all furnished. Nothing the owner did made them unusable or unavailable.

4. It has received frequent application. Ferguson v. Moore-McCormick, 1957, 352 U.S. 521, 523, 77 S.Ct. 451, 1 L.Ed.2d 511, 1957 AMC 647; Sentilles v. Inter-Carribean Shipping Corp., 1959, 361 U.S. 107, 80 S.Ct. 173, 4 L.Ed.2d 142, 1960 AMC 10; Kernan v. American Dredging Co., 1958, 355 U.S. 426, 78 S.Ct. 394, 2 L.Ed.2d 382, 1958 AMC 251; Schulz v. Pennsylvania R. Co., 1956, 350 U.S. 523, 76 S.Ct. 608, 100 L.Ed. 668, 1956 AMC 737; Davis v. Virginia Ry. Co., 1959, 361 U.S. 354, 80 S.Ct. 387, 4 L.Ed.2d 366; Inman v. Baltimore & Ohio R. Co., 1959, 361 U.S. 138, 80 S.Ct. 242, 4 L. Ed.2d 198; Conner v. Butler, 1959, 361 U.S. 29, 80 S.Ct. 21, 4 L.Ed.2d 10; Harris v. Pennsylvania R. Co., 1959, 361 U.S. 15, 80 S.Ct. 22, 4 L.Ed.2d 1; Moore v. Terminal R. Ass'n of St. Louis, 1958, 358 U.S. 31, 79 S.Ct. 2, 3 L.Ed.2d 24; Ferguson v. St. Louis-San Francisco R. Co., 1958, 356 U.S. 41, 78 S.Ct. 671, 2 L.Ed.2d 571; Stinson v. Atlantic Coast Line R. Co., 1957, 355 U.S. 62, 78 S.Ct. 136, 2 L.Ed.2d 93; Gibson v. Thompson, 1957, 355 U.S. 18, 78 S.Ct. 2, 2 L.Ed. 2d 1; Ringhiser v. Chesapeake & Ohio R. Co., 1957, 354 U.S. 901, 77 S.Ct. 1093, 1 L.Ed.2d 1268; see annotation on sufficiency of evidence in FELA cases, 4 L. Ed.2d 1787.

The key to this was the key. The key was in Schlichter's pocket.

It follows that the Court was correct in directing the verdict.

Affirmed.