Margaret Ann WILKINS, as Administratrix of the Estate of William Lane Wilkins, Plaintiff-Appellant,

v.

AMERICAN EXPORT ISBRANDTSEN LINES, INC., Defendant-Appellee.

No. 764, Docket 35391.

United States Court of Appeals, Second Circuit.

Argued April 29, 1971.

Decided June 18, 1971.

Herbert Lebovici, New York City (Kenneth Heller, New York City, on the brief), for plaintiff-appellant.

Thomas H. Healey, New York City (Foley, Grainger & Darby, Walter A. Darby, Jr., Daniel L. Stonebridge, New York City, of counsel), for defendant-appellee.

Before HAYS and FEINBERG, Circuit Judges, and BLUMENFELD, District Judge.*

BLUMENFELD, District Judge:

Plaintiff brought this action as administratrix of the Estate of William Lane Wilkins, an officer in the merchant marine, against his employer, the owner of the ship on which he was serving, to recover damages for his death, which resulted from a heart attack suffered at sea. We are constrained to remand for a new trial because of error in the exclusion of evidence relevant to the issue of proximate cause.

Wilkins was employed by the defendant as Chief Officer on board the S.S. Extavia from August 1964, when he signed articles for her forthcoming voyage, until October 6, 1964, the date of his death. On September 18, 1964, while traversing a leg of the homebound passage between Leghorn, Italy, and Barcelona, Spain, the S.S. Extavia, then in command of the second officer, suffered a collision with another vessel. Following the collision, Wilkins was required by the defendant to put in overtime hours in the performance of his duties (which were soon augmented by those of the second mate, who was relieved of all navigational duties on September 20, at 0400 hours). The core of the plaintiff's contention was that the overtime work, required of Wilkins by the defendant in violation of 46 U.S.C. §§ 235 and 673, was the proximate cause of the decedent's heart attack and ensuing death.

Whether measured by the provisions of one or the other of these statutes.[1]

---

* Of the District of Connecticut, sitting by designation.

1. The trial court correctly held that insofar as overtime work aboard ship was concerned § 235 was superseded by § 673. Section 235 is applicable only to officers, whereas § 673 applies to seamen as well. Indeed, § 673 forbids a shipowner from requiring or permitting work for more than 8 hours in one day, whereas § 235 provides that an officer shall not "be required to do duty to exceed nine hours of any twenty four while in port, * * or more than twelve hours of any twenty four at sea * * *" (overtime work in emergencies is excepted, see p. 3709, infra).

the evidence at trial was that following the collision, with the lone exception of Sunday, October 4,[2] Wilkins had worked overtime on every day consecutively from September 19, 1964, through October 6, 1964, when he worked 19 hours. After he went off duty during the night of October 6, Wilkins showered and changed his clothes. He then made a brief visit to the bridge and returned to his cabin. Shortly thereafter he suffered an acute heart attack manifested by extreme pain in his chest. A hurriedly summoned Coast Guard cutter rushed him to a hospital ashore, but he was reported to have died within minutes after his arrival there.

## I.

During the early part of the trial, the court admitted into evidence as an exhibit a chart showing the hours concededly worked by Wilkins each day, broken down into watches within each 24-hour period. The first assigned error we consider is a ruling made with respect to this exhibit at a later stage of the trial. While evidence was still being taken, the trial court withdrew the exhibit and substituted in its place a truncated chart disclosing only the hours the decedent had worked aboard the ship on October 3, 4, 5 and 6.

To put this singular ruling into perspective, we set forth a brief resume of a portion of the medical testimony which apparently induced it. Two experts, one for each side, testified on the issue of causal connection between Wilk-

ins' overtime work and his death. What little conflict there was in the testimony of the medical experts as to the final cause of death was attributable to the differences in their medical interpretations of the stated cause of death on the death certificate and the pathological reports and slide sections resulting from an autopsy. They did not differ as to the final cause of death. They agreed he died as a result of an acute coronary insufficiency which induced ventricular fibrillation,[3] finally resulting in death.

In the opinion of Dr. Jacobi, who testified for the plaintiff, the "coronary insufficiency" was caused by a heart muscle spasm. Each successive link in the chain of causation following the muscle spasm to ultimate death was supported by evidence obtained at the autopsy. But there was no anatomical evidence of what caused the heart muscle spasm. Plaintiff's counsel asked Dr. Jacobi whether there was a causal connection between the "overtime" and the heart muscle spasm. To what the judge described at a "bit-by-bit" hypothetical question, embracing the hours worked and the duties performed by Wilkins from the time of the collision at sea until Wilkins' heart attack, Dr. Jacobi answered:

"I would say that both the physical activity over those areas that you have described on the sixth[4] and the tensional changes incident to the supervision, are perfectly adequate to explain the acute coronary insufficiency *by way of the spasm* of the coronary artery which eventuated in the

2. The number of hours worked by Wilkins each day:

| | |
|---|---|
| September 19—17 hours | September 28—11 hours |
| September 20—20 hours | September 29—11 hours |
| September 21— 9 hours | September 30—11 hours |
| September 22—19 hours | October 1 —11 hours |
| September 23—12 hours | October 2 —11 hours |
| September 24—15 hours | October 3 —10 hours |
| September 25—15 hours | October 4 —7½ hours |
| September 26—11 hours | October 5 —12 hours |
| September 27—11 hours | October 6 —19 hours |

3. This was an explanation of what happens when insufficient blood flows through the arteries to the heart (coronary insufficiency). The heart keeps contract-

ing, but with insufficient blood it does not contract as a unit. Instead, each little fibre in the heart contracts on its own, causing the heart to flutter at an extremely high rate, a condition incompatible with life.

4. The nature and extent of the kind of work he had been doing as exemplified by that particular day was fully described at trial by a pilot who had been taken aboard to navigate the ship through the St. Lawrence Seaway from Iroquois Lock to Toronto.

changes that were found at autopsy." (Emphasis added.)

On redirect examination when asked whether the prior work history between September 18, 1964, and the vessel's arrival in Montreal (October 3) would have "any medical relationship to the susceptibility of the man to an acute coronary insufficiency after October 3, when the vessel left for Montreal," he answered that it would. After accepting the court's invitation to have the question read again, he answered "No."[5]

It is this response which was the apparent basis for the court's evidentiary ruling that the truncated chart be substituted for the chart covering the entire period from the collision to Wilkins' death.

█ It was error to withdraw from the jury the evidence of Wilkins' overtime work during the period from the collision to October 3. The jury was entitled to have this broader basis for an evaluation of the cause of the decedent's heart muscle spasm. It was not bound by the perimeter of expert testimony but rather was entitled to substitute its own practical judgment for that of the expert. The fact that the question put to the doctor is the kind which cannot be answered on the basis of empirical knowledge or with scientific accuracy, does not mean that a jury's answer to it would be irrational. They were not bound to stay on a scientific platform.[6]

The idea that proximate cause between an internal human physical condition and external stimuli cannot be established except by the testimony of a medical witness was expressly rejected by the Supreme Court in Sentilles v. Inter-Caribbean Shipping Corp., 361 U.S. 107, 109, 80 S.Ct. 173, 175, 4 L.Ed.2d 142 (1959):

"The jury's power to draw the inference that the aggravation of petitioner's tubercular condition, evident so shortly after the accident, was in fact caused by that accident, was not impaired by the failure of any medical witness to testify that it was in fact the cause. * * * The members of the jury, not the medical witnesses, were sworn to make a legal determination of the question of causation."

Any possibility that the error might be regarded as harmless in light of the other evidence at the trial must be rejected. The force of the trial judge's action was enhanced by his specific instruction to the jury not to consider any evidence pertaining to the decedent's activities prior to October 3, 1964.[7]

## II.

An adverse ruling by the trial court on the plaintiff's claim that she was entitled to the benefit of a presumption on the issue of proximate cause is also asserted as error. At the trial, the judge rejected the plaintiff's contention that the burden was on the defendant shipowner to prove that its statutory violation not only did not but could not have contributed to the decedent's death. This contention relates to the inescapable precondition to liability that there must be a causal connection between the tortious conduct of the defendant and

---

5. The sense educible from these two conflicting answers is, at least, ambiguous. On recross examination almost immediately thereafter, when asked, "do you mean that this man would have lived a normal life expectancy if he did not come into another situation of tensions and long hours of work," he answered: "That's right."

6. Actually, the plaintiff's doctor had testified that it was his professional opinion that a man with a job involving tension and occasional manual work is a candidate for a heart attack if the tension is sufficient and prolonged enough or the work prolonged enough under those (previously described) conditions.

7. The jury was charged:
"In this determination of whether the defendant violated the statute in question, you are to consider only the evidence which pertains to the decedent's activities on the ship from October 3rd, 1964 onward. You are not to consider any evidence which pertains to the decedent's activities prior to October 3rd, 1964."

the injury sustained by the plaintiff.[8] Since this issue is likely to arise on a retrial, we deem it advisable to consider it now. We think Judge Levet properly allocated the burden of proof on the issue of causation to the plaintiff.

A feature of our Anglo-American adversary system is that the task of adducing evidence rests on the parties in the proceeding. Inherent in that system is the general rule that, as between two parties, he who desires to have judicial action taken in his behalf has the burden of producing the evidence which is a prerequisite to such action. See generally, IX J. Wigmore, Evidence 270–84, §§ 2485–2487 (3rd ed. 1940, Supp.1970). Of course, in some situations proof of one fact provides a basis for inferring another. However, there is a significant difference between using one fact as evidence of another, and using the proof of one fact to impose on the party against whom it is directed the burden of proving the non-existence of another. In order to shift the burden of proof to that extent there must be a presumption that the other exists.

■ The operation of a presumption is often described, for this is a rule of law as to which the jury must be instructed. But the cases do not clearly define the ingredients out of which a presumption is created.[9] It is generally understood that in law for a specified fact to be presumptive evidence of another it must be one which in common experience leads naturally and logically to that other. Tot v. United States, 319 U.S. 463, 467, 63 S.Ct. 1241, 87 L.Ed. 1519 (1943). Cf. McFarland v. American Sugar Refining Co., 241 U.S. 79, 86, 36 S.Ct. 498, 60 L.Ed. 899 (1916).

■ It is clear, we think, that in holding in part I of this opinion that the evidence of Wilkins' earlier overtime work was not so devoid of probative value as to forbid an inference that it caused his heart attack, we were not saying that it is common experience that any amount of overtime work in violation of the statute causes bodily injury to a seaman. A justifiable inference is not a synonym for a presumption.

■ The statutes on which liability in this case was predicated contain no support for the kind of presumption the plaintiff seeks to have us apply. Whatever light is shed on this point indicates the contrary. The following portions are relevant. Section 673 of Title 46 U. S.C. provides:

"No licensed officer or seaman * * * shall be required or permit-

---

8. The plaintiff's reliance on Kernan v. American Dredging Co., 355 U.S. 426, 78 S.Ct. 394, 2 L.Ed.2d 382 (1958), to circumvent that precondition is misplaced. Although it was decided in that case that the scope of liability imposed on shipowners in Jones Act cases for injuries to seamen resulting from, or caused by, a violation of a statutory duty is not limited to those injuries against which the statute is designed to afford protection, the Court did not go so far as to hold that a causal connection was presumed to exist between the statutory violation and the alleged injury. In Nolan v. Greene, 383 F.2d 814, 817 (6th Cir. 1967), it was expressly held that *Kernan* does not relieve the plaintiff of the burden of proving causation:

"Although the case does hold that recovery may be had under the Jones Act for the death of a seaman in the absence of negligence when there has been a breach of a statutory duty, there must be a causal connection between the breach of the statutory duty and the death of the seaman. In the instant case there is no proof that failure to provide fire extinguishers even remotely caused the death of plaintiff's husband."

See also, Epling v. M. T. Epling Co., 435 F.2d 732, 735 (6th Cir. 1970).

9. Professor McCormick says:
"The reasons for the recognition of presumptions by the courts are various. First and foremost is the reason of probability. In certain recurring fact-situations it becomes accepted by the judges that the proof of fact A renders the inference of the existence of fact B so probable that it is sensible and time-saving to assume the truth of fact B until the adversary disproves it." C. McCormick, Evidence 641, § 309 (1954).

ted to work more than eight hours in one day except in case of extraordinary emergency affecting the safety of the vessel and/or life or property. * * * [N]or shall any licensed officer or seaman in the deck or engine department be required to work more than eight hours in one day; but these provisions shall not limit either the authority of the master or other officer or the obedience of the seamen when in the judgment of the master or other officer the whole or any part of the crew are needed for maneuvering, shifting berth, mooring, or unmooring, the vessel or the performance of work necessary for the safety of the vessel, her passengers, crew, and cargo, or for the saving of life aboard other vessels in jeopardy, or when in port or at sea, from requiring the whole or any part of the crew to participate in the performance of fire, lifeboat, or other drills. * * *"

The statutory exceptions from the prohibition of overtime work thus specifically permit more strenuous exertion than usual under more difficult and tension-producing conditions than ordinarily faced. Thus, the statute is obviously at odds with a view what in common experience any overtime work leads naturally and logically to bodily injury of the worker, and furnishes no basis for fashioning the kind of presumption the plaintiff urges upon us.

The rule for which the plaintiff contends has been excerpted from the rule of The Pennsylvania,[10] named after the case in which it was first enunciated by the Supreme Court, The Pennsylvania, 86 U.S. (19 Wall.) 125, 22 L.Ed. 148 (1873). The rule of The Pennsylvania, examined in its entirety, incorporates the reasons for its own adoption:

"* * * But when, as in this case, a ship at the time of a collision is in actual violation of a statutory rule intended to prevent collisions, it is no more than a reasonable presumption that the fault, if not the sole cause, was at least a contributory cause of the disaster. In such a case the burden rests upon the ship of showing not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been. Such a rule is necessary to enforce obedience to the mandate of the statute. * * *" Id. at 136.

The logical probability that fault of the ship is the cause of a collision is based on wide experience in maritime navigation and is authoritatively attested to by Professors Gilmore and Black, who report:

"The collision case is rare in which there is not at least some arguable reason for regarding both vessels at fault * * *" The Law of Admiralty, supra, at 408 § 7–6.

Moreover, The Pennsylvania rule might be regarded as fair because each ship involved in a collision has superior means to the access of evidence bearing on fault.[11] However, no such considerations apply to the idiosyncrasies of in-

---

10. The Pennsylvania rule, which shifts the ultimate burden onto the defendant to disprove the presumed fact, has been assessed as " * * * a drastic and unusual presumption. * * *" G. Gilmore & C. Black, The Law of Admiralty, 404, § 7–5 (1957). But see Revised Draft of Proposed Rules of Evidence for the United States Courts and Magistrates (prepared by the Committee on Rules of Practice and Procedure of the Judicial Conference of the United States) Rule 301 (March 1971).

11. It is noteworthy that The Pennsylvania rule, even as applied in ship collision cases, has been abolished by those most affected by its operation. The legal presumption of fault in collision cases was expressly rejected in the thoroughly considered and carefully drafted Brussels Collision Liability Convention of 1910, to which most nations, including England from whose law our Supreme Court adopted it, now adhere. Article 6 of the Convention provides: "There shall be no legal presumption of fault in regard to liability for collision." See, Comment, The Difficult Quest for a Uniform Maritime Law, 64 Yale L.J. 878, 888 and nn. 51, 52; Law of Admiralty, supra, at 401.

formation which bear on the cause of an injury sustained by a seaman.

Finally, as a judgmental matter, we are not persuaded that there are broad considerations of policy which require that we extend the admiralty rule of The Pennsylvania beyond the chosen area of ship collisions to embrace Jones Act cases.

The judgment for the defendant is reversed and a new trial ordered.

HAYS, Circuit Judge (concurring in the result):

I concur in the result and in Section I of the majority opinion.