RICARDO N., INC., Petitioner,

v.

Maria Margarita TURCIOS DE ARGUE-TA, as Administrator of the Estate of Juan Luis Argueta, Deceased, and as Guardian of Xiomara Margarita Argueta, Maria de Los Angeles Argueta, Jorge Samuel Argueta, and Maria Aidee, Minors, Respondents.

No. 94–0111.

Supreme Court of Texas.

Argued Nov. 17, 1994.

Filed June 8, 1995.

Christa Brown, Austin, G. Don Schauer, Daniel D. Pipitone, Corpus Christi, for petitioner.

Miguel A. Saldana, Richard E. Zayas, Brownsville, for respondents.

HECHT, Justice, delivered the opinion of the Court.

With no word of explanation, Juan Luis Argueta, a seaman on the shrimping vessel, the *Betty N,* jumped overboard in the middle of the night in high seas about eighty miles off the Texas coast. His disappearance and presumed death make it impossible to ascer- tain his motives, but there are indications that he acted out of distress over rumors of his wife's infidelity. She, Maria Margarita Turcios de Argueta, on behalf of herself, Argueta's estate and his four minor children, sued the *Betty N* and its owner, Ricardo N., Inc., alleging negligence under the Jones Act, 46 U.S.C.App. § 688 (1988), and unseaworthi- ness under the Death on the High Seas Act ["DOHSA"], 46 U.S.C.App. § 761 (1988). Af- ter trial to the bench, the court found for Turcios on both claims and rendered judg- ment against both defendants for actual and punitive damages, and pre- and post-judg- ment interest. The court of appeals re- versed the judgment against the *Betty N,* and reversed the punitive damages award, but affirmed the judgment for actual dam- ages and interest against Ricardo N. 870 S.W.2d 95.

Of the several arguments defendants make on appeal, we find one dispositive. We hold that Turcios was obliged to prove that defen- dants caused Argueta's death, and that she failed to do so. Accordingly, we reverse the judgment of the court of appeals and render judgment that Turcios take nothing.

### I

Argueta, a citizen of El Salvador, came to Brownsville to live with his sister. He found work as a shrimper on the *Betty N,* a fishing vessel with a crew of four: the captain, who was in command of the vessel; a rigman, who worked the nets; and two headers, who looked for shrimp. Argueta was one of the headers.

Argueta had worked on the *Betty N* about six months when he learned that his wife, who was still in El Salvador, was being un- faithful to him. Disturbed by this news, Argueta asked his wife to join him in the United States, and she traveled as far as Belize. Argueta sent her money for the rest of the trip via a friend, but later heard that the friend also had an affair with her. Ar- gueta was even more upset at this latest episode, but by the time he next embarked upon the *Betty N* he seemed fine and did not mention his wife.

On the third day at sea Argueta asked to be taken to Houston. The captain responded

that he would either call the Coast Guard to come get Argueta or put him ashore at the nearest port the next morning. Argueta began working that evening, but later threw his stored clothes overboard and told the captain that he did not want to work. Argueta went to his cabin, either voluntarily or on the captain's orders. At 1:30 a.m., the crew was still working and the boat was moving forward at about two miles per hour. The night was clear with a bright moon; the seas were high, four to six feet; the wind was blowing at fifteen to twenty knots. Argueta came on deck wearing only his pants and shoes, and stripped to his underwear. When a crew member asked what he was doing, Argueta, without reply, jumped overboard. Argueta was a good swimmer and the water was warm enough for someone to survive in it for several hours.

The captain immediately ran forward to the pilot house to stop the vessel. No flare was thrown to mark the spot where Argueta entered the water, nor was a life ring thrown because the crew could not see Argueta. The captain marked the vessel's position on the chart and recorded the compass reading in the log. Meanwhile, the rigman raised the nets, which took about fifteen minutes. The crew then called for help using citizen band radios, which had a shorter range than the ship's sideband radios. About eighty minutes after Argueta jumped overboard, the crew contacted another vessel, which in turn contacted the Coast Guard. The *Betty N* searched for Argueta the rest of the night, the Coast Guard searched the next day, and the *Betty N* fished in the same area for three days, but Argueta was never found. Turcios testified that Argueta did not have suicidal tendencies.

The trial court found that the *Betty N* was unseaworthy because it was not properly equipped, nor its crew properly trained, for emergencies. There is no dispute that the ship did not have flares or cable cutters to jettison the nets. There is no evidence whether the ship's life preservers did or did not have lights as required by Coast Guard regulation, 46 C.F.R. § 25.25–13. No evidence suggests that any of the crew members had been trained for emergencies while employed by Ricardo N., although the captain had received such instruction in obtaining certification as a vessel captain in El Salvador. The safety materials on the *Betty N* were in English, and only the rigman could read English. It is unclear whether anyone knew how to use the sideband radios. The trial court also found that Ricardo N. was negligent in failing to prepare the *Betty N* and its crew for emergencies. The court found that the crew should have detached the fishing nets instead of lifting them, radioed for help immediately with a sideband radio, thrown out life preservers, set off flares, posted a lookout to try to keep Argueta in sight, and turned the vessel toward the direction Argueta jumped overboard. The trial court awarded $100,000 to Turcios and $50,000 to each of the four minor plaintiffs. The court also awarded plaintiffs $200,000 in punitive damages.

The court of appeals reversed the punitive damage award, holding that such damages cannot be recovered under either the Jones Act or the DOHSA. The appeals court also reversed the judgment against the *Betty N,* holding that jurisdiction of *in rem* suits in admiralty is exclusive in the federal courts. Turcios does not appeal from either of these holdings. The court of appeals affirmed the award of actual damages against Ricardo N.

Ricardo N. denies that any evidence supports the trial court's findings of unseaworthiness and negligence, but it does not argue for reversal of the court of appeals' judgment based on this lack of evidence. Rather, Ricardo N. argues that there is no evidence that the unseaworthiness and negligence found by the trial court could have caused Argueta's death. It points to the testimony of Turcios' own expert to the effect that even if the *Betty N* had done everything perfectly, it would "probably not" have made any difference in rescuing Argueta, and that it was "sheer and utter speculation" to think that anything the *Betty N* might have done differently could have saved him. The court of appeals determined that there is some evidence to support the trial court's finding of causation, and that in any event, there should be a presumption of causation under the

circumstances of this case, a presumption that Ricardo N. failed to overcome.

## II

■ Before we consider the evidence of causation, we must first identify the duty Ricardo N. owed Argueta. That duty is prescribed by the marine rescue doctrine, which holds that when a person goes overboard the ship must use every reasonable means to retrieve him from the water if he can be seen from the ship, and if he cannot be seen, must search for him as long as it is reasonably possible he is alive. *Reyes v. Vantage S.S. Co.,* 609 F.2d 140, 142 (5th Cir.1980). The doctrine thus stated has two branches. 1B BENEDICT ON ADMIRALTY § 30, at 3–223 to 3–239 (7th ed. 1991). One branch—"search" cases—concerns seamen who disappear, having apparently fallen overboard; their "presence or location in the water is not readily discernible from the ship." *Reyes,* 609 F.2d at 142 (quoting 1B BENEDICT ON ADMIRALTY § 30 at 3–225 (6th ed. 1976)); *Gardner v. National Bulk Carriers,* 310 F.2d 284, 286 (4th Cir.1962), *cert. denied,* 372 U.S. 913, 83 S.Ct. 728, 9 L.Ed.2d 721 (1963). In these situations, the ship must search for the seaman as long as it is reasonably possible he is alive in the water, and must, of course, retrieve him if found. *Reyes,* 609 F.2d at 142. The other branch—"rescue" cases—involves "those where a seaman has fallen overboard and is struggling in close proximity to and is visible from the ship." 1B BENEDICT ON ADMIRALTY § 30, at 3–225. In rescue situations, the ship must use "every reasonable means to retrieve the seaman from the water." *Reyes,* 609 F.2d at 142.

■ Whether a seaman falls or jumps into the water, the duty to rescue arises the instant he goes overboard. *Id.* at 143. The duty arises because the seaman must follow orders, even orders putting him in danger; because the sea is inherently dangerous; and because the vessel represents the only means to save the life of a human being with no other source of help. *See Harris v. Pennsylvania R.R.,* 50 F.2d 866, 868–69 (4th Cir. 1931).

## III

The court of appeals thought that the causal connection between the conduct of a ship's crew and the failure to rescue a man overboard is often presumed in "rescue" cases in which the seaman remains visible, as opposed to "search" cases in which the seaman has disappeared, and that this is a "rescue" case. Ricardo N. argues that this is not a "rescue" case because there is no evidence Argueta could be seen from the moment he entered the water. Thus, Ricardo N. contends that the appeals court applied the wrong branch of the marine rescue doctrine. This dispute assumes that the proof required for causation depends on the nature of the duty owed to the seaman. We are unable to discern such a connection, either in the caselaw or in the underlying justification for presumptions.

■ Caselaw illustrates that whether causation is presumed does not depend on which branch of the marine rescue doctrine applies. *E.g., Abbott v. United States Lines,* 512 F.2d 118 (4th Cir.1975) (search case, causation presumed); *Grantham v. Quinn Menhaden Fisheries,* 344 F.2d 590 (4th Cir.1965) (rescue case, causation not presumed); *Gardner v. National Bulk Carriers,* 310 F.2d 284 (4th Cir.1962) (search case, causation presumed); *Schlichter v. Port Arthur Towing,* 288 F.2d 801 (5th Cir.), *cert. denied,* 368 U.S. 828, 82 S.Ct. 50, 7 L.Ed.2d 32 (1961) (rescue case, causation not presumed); *Kirincich v. Standard Dredging Co.,* 112 F.2d 163 (3rd Cir. 1940) (rescue case, causation presumed); *Harris v. Pennsylvania R.R.,* 50 F.2d 866 (4th Cir.1931) (rescue case, causation not presumed); *In Re Joint Adventure, Inc.,* 1989 A.M.C. 2762, 1989 WL 201244 (S.D.Ala. 1989) (search case, causation not presumed); *Kiesel v. American Trading & Prod. Co.,* 347 F.Supp. 673 (D.Md.1972) (search case, causation not presumed); *Britt v. Marine Transp. Lines,* 1970 A.M.C. 652 (S.D.Tex.1969) (rescue case, causation not presumed). As these cases show, causation is presumed, in either branch of the marine rescue doctrine, for two main reasons—violation of a statutory or regulatory duty (the *"Pennsylvania* rule"), and equity.

The first reason for presuming causation is exemplified in *The Pennsylvania,* 86 U.S. (19

Wall.) 125, 22 L.Ed. 148 (1874), holding that a party violating a statute must prove that its violation not only did not contribute, but could not have contributed, to causing the collision of two vessels. *Id.* at 136–37; GRANT GILMORE & CHARLES L. BLACK, JR., THE LAW OF ADMIRALTY § 7–5 (2d Ed.1975). The *Pennsylvania* presumption—effectively shifting the burden of disproving causation to the defendant—has been extended to rescue cases in the context of actions based on the Limitation of Liability Act, 46 U.S.C.App. §§ 181–196 (1988). *See In re Seaboard Shipping Corp.,* 449 F.2d 132, 136 (2nd Cir.1971), *cert. denied,* 406 U.S. 949, 92 S.Ct. 2038, 32 L.Ed.2d 337 (1972). In *Reyes,* the Fifth Circuit recognized the presumption in "rescue" cases under the Jones Act when a Coast Guard regulation was breached. 609 F.2d at 144–45. But even when a statute or regulation is violated, courts do not uniformly shift the burden, especially when the causal connection between breach of the statute and the injury is weak. *See Wilkins v. American Export Isbrandtsen Lines,* 446 F.2d 480, 484 (2d Cir.1971), *cert. denied,* 404 U.S. 1018, 92 S.Ct. 679, 30 L.Ed.2d 665 (1972).

The equitable basis for presuming causation is illustrated in a number of cases. One, *Reyes,* involved a claim under the Jones Act for the death of a seaman who dove overboard into the ocean to swim, having become quite drunk on beer served on board. As the seaman began swimming to a mooring buoy a few hundred feet away from the ship, the crew spotted him immediately and knew "from the time of first sighting that Reyes was in mortal danger." 609 F.2d at 142. By the time the crew could act, Reyes was beyond the range of a hand-thrown life ring or line. No one made any effort to rescue him as he struggled against the current toward the buoy, became motionless in the water, and died. The court concluded that the ship violated Coast Guard regulations by failing to have a rocket-powered line-throwing device, which could have been used to save Reyes. *Id.* at 143. The court remanded on the issue of causation, the resolution of which involved a number of difficult questions: whether the required line-throwing device would have been properly positioned to help Reyes; whether it would have been reasonable to use

the device; and whether a thrown line would have saved the seaman's life. The court recognized that resolving these causation issues would be very difficult:

> [C]ausation in this situation turns on a number of either ambiguous or hypothetical issues of fact ... made most difficult by the facts that (i) the ship lacked required equipment which could conceivably have been used for rescue and by (ii) the actual failure of the ship to even attempt a rescue. These omissions are solely the fault of the ship.

*Id.* at 144. Partly because of these evidentiary difficulties, the district court was ordered on remand to presume the existence of causation. *Id.*

In *Gardner v. National Bulk Carriers,* 310 F.2d 284 (4th Cir.1962), *cert. denied,* 372 U.S. 913, 83 S.Ct. 728, 9 L.Ed.2d 721 (1963), the seminal "search" case, Gardner disappeared from his ship sometime within a 6-½ hour period. The ship's master alerted the Coast Guard to Gardner's disappearance but did nothing more. Presuming the earliest time Gardner could have gone overboard, the trial court found he was beyond the possibility of being rescued when he was first missed. The Fourth Circuit reversed because the trial court's basic premise was flawed: no one could know when Gardner went overboard because the ship failed to make any search at all. As the court explained: "Unless a search was made by that or other vessels in the area, it could not be determined that Gardner was beyond rescue. This is the classic situation which in reason and humanity called for the exercise of every reasonable effort to ascertain his whereabouts." *Id.* at 287. The court rejected the ship's proximate cause argument—that its failure to reverse course did not of itself cause the death— because failing to search "obliterated all possibility of evidence to prove whether a search, if undertaken, would have succeeded or failed." *Id.*

Both *Reyes* and *Gardner* acknowledged and yielded to "practical considerations of proof where the defendant's negligence [made] it difficult or impossible to prove causation...." Lori R. Ellis, Note, *Loss of*

*Chance as Technique: Toeing the Line at Fifty Percent*, 72 Tex.L.Rev. 369, 392 (1993). Further, shifting the burden of proof represented not only a practical solution to the causation conundrum, it also represented the most equitable course. Unlike the *Betty N* in the present case, neither ship in *Reyes* or *Gardner* did anything to help the overboard seaman. Indeed, the ship's act in *Reyes* of running a "floating dram shop" made proving causation difficult; the ship provided Reyes the beer that may have impaired the seaman's judgment and abilities. *See Reyes*, 609 F.2d at 142 & n. 1. The *Betty N* has not by any such acts or omissions impaired Turcios' ability to show causation.

A case in contrast with *Reyes* and *Gardner* is *Schlichter v. Port Arthur Towing*, 288 F.2d 801 (5th Cir.), *cert. denied*, 368 U.S. 828, 82 S.Ct. 50, 7 L.Ed.2d 32 (1961), a Jones Act negligence claim for the death of a seaman. Schlichter was left in charge of a moored vessel while others were at home on shore leave. Schlichter locked up the vessel and went ashore with two friends, Redden and Slade. Later that night, the group returned to the vessel drunk, and Schlichter fell overboard. Both companions heard the splash, and Redden dove into the water to save Schlichter. Slade saw Redden's head but never saw Schlichter's. Slade then went after life jackets in the nearby galley, but the galley was locked. Slade ran forward to the wheelhouse, which was not locked, got life jackets, and returned to the stern. By that time, both Schlichter and Redden had disappeared. The Jones Act claim rested on the inadequacy or unavailability of life jackets, a violation of Coast Guard regulations. Life jackets were not immediately available, however, because Schlichter himself had locked all the doors to the main deck. There was no evidence that Schlichter's employer had overridden Schlichter's control of the vessel—*i.e.*, to lock the doors or not. Even with the very light burden of Jones Act causation—to prove that employer negligence played any role in the injury—the plaintiff in *Schlichter* offered no evidence of causation. Slade never saw Schlichter and never heard Redden or Schlichter cry out. No evidence showed where Schlichter was in the water or where he might have been seen. Even if life jack-

ets had been immediately at hand, it was "sheer fantasy" to expect anyone to have been rescued. *Id.* at 806. Finally, Schlichter's drunkenness made determining causation difficult: "Whether there is a reasonable likelihood that Schlichter would have been saved cannot avoid taking into account the undisputed evidence about the substantial ... state of his inebriation as it bore on his capacity for self help or survival." *Id.* The plaintiff, Schlichter's widow, was not aided by a presumption of causation, at least in part, because Schlichter's own acts made proving causation difficult. *Id.* at 806–07.

*Britt v. Marine Transport Lines*, 1970 A.M.C. 652 (S.D.Tex.1969), is identical to the present case in all material respects. Britt, a seaman aboard a tanker in the Texas City channel, learned that his wife had been injured in a car accident. He asked the master of the vessel for permission to leave immediately, and the master granted permission to do so after they had completed the maneuver in which the vessel was involved. Impatient, Britt jumped overboard. The pilot took appropriate evasive maneuvers and radioed nearby tugs to go to Britt's rescue. Britt nonetheless drowned. The court dismissed the complaint, concluding that Britt's death "was the sole and proximate result of his own negligence in voluntarily jumping overboard and attempting to swim to shore in violation of the Master's orders for him to remain on board". *Id.* at 656. The *Reyes* court noted that the trial court's finding in *Britt* relied on the seaman's offsetting negligence and on lack of causation. 609 F.2d at 143 n. 3.

■ Neither of the marine rescue doctrine's rationales for presuming causation applies to the current case. Ricardo N. did not violate a statutory or regulatory requirement. And equity does not weigh in favor of the presumption because Argueta's own actions—jumping overboard without his life vest, at night, in high seas—made it very difficult for Ricardo N. to disprove causation. Under these facts, as in *Britt*, the burden of proving causation properly remains with the plaintiff.

## IV

We thus come to the question whether any evidence proves Ricardo N. caused Argueta's death. The plaintiff's burden in a Jones Act case has been characterized as "featherweight", *Alverez v. J. Ray McDermott & Co.*, 674 F.2d 1037, 1042 (5th Cir.1982), and is carried if defendant's negligence contributes "even in the slightest degree" to the injury. *Sanford Bros. Boats, Inc. v. Vidrine*, 412 F.2d 958, 962 (5th Cir. 1969); *see Reyes*, 609 F.2d at 146. Even under this standard, Turcios still did not prove causation. There is no evidence that the *Betty N's* crew could have done anything to save Argueta, as Turcios' own expert acknowledged. Asked whether the crew should not have thrown Argueta a flotation device, the captain replied: "What were they going to throw him? They didn't see him." A life ring thrown indiscriminately overboard does no good, and presents no evidence of causation. *See Schlichter*, 288 F.2d at 805–806.

Because Turcios' causation claims do not meet the Jones Act standard for causation, they cannot meet the more stringent causation standard for unseaworthiness, which demands proximate cause in the traditional sense. *E.g., Smith v. Trans–World Drilling Co.*, 772 F.2d 157, 162 (5th Cir.1985); *Alverez*, 674 F.2d at 1042–1043. Accordingly, we conclude that Turcios failed to establish Ricardo N.'s liability either for negligence or unseaworthiness, and is not entitled to recover damages against Ricardo N.

## V

Our conclusion in this case that judgment should be rendered against Turcios makes it unnecessary for us to address other complaints Ricardo N. raises that would entitle it only to a remand for a new trial. While the effect of our decision is to vacate the court of appeals' opinion, we are concerned that that opinion may be cited as authority on issues which we have not addressed with the notation that the judgment of the court of appeals was "reversed on other grounds". We therefore address these issues briefly.

Turcios timely requested a jury but did not pay the jury fee. A few days before the case was set for trial, Turcios' counsel appeared before the court and announced ready for a non-jury trial. Arriving later and learning that the case was set for a bench trial, Ricardo N.'s counsel paid the fee and made its own jury request, which the trial court denied. TEX.R.CIV.P. 216. Ricardo N. then removed the case to federal court based on the Limitation of Liability Act, 46 U.S.C.App. §§ 181–196 (1988).

Four years later the federal district court remanded the case to state court. The federal court specifically found that Ricardo N. had removed the case in good faith and Ricardo N.'s conduct did not merit sanctions under Rule 11 of the Federal Rules of Civil Procedure. Notwithstanding these findings, the state trial court found that Ricardo N. had removed for the purpose of delay, and sanctioned Ricardo N. by ordering that the case be tried as it stood before removal, that is, before the bench. The judge also disallowed the testimony of witnesses designated after the original trial date, denied trial amendments and cross-examination about Turcios' status as the children's representative, denied Ricardo N.'s requests for further discovery and for a continuance, refused to deem admitted requests for admissions that Ricardo N. had filed in federal court, and denied Ricardo N.'s renewed request for a jury trial. The court of appeals approved all of these rulings. 870 S.W.2d at 103–13.

Assuming Ricardo N.'s request for a jury in advance of the first trial setting was not timely made, that request had certainly become timely when the case was remanded from federal court four years later. *Halsell v. Dehoyos*, 810 S.W.2d 371 (Tex. 1991) (per curiam). The same lapse of time made Ricardo N.'s designation of witnesses timely. *H.B. Zachry Co. v. Gonzalez*, 847 S.W.2d 246 (Tex.1993) (per curiam). The trial court abused its discretion in sanctioning Ricardo N. for removing the case in bad faith when the federal court had already determined that the removal was not in bad faith. Ricardo N. was entitled to have the case tried in its posture following remand. We disapprove the court of appeals' opinion to the extent it reaches contrary conclusions.

\*     \*     \*     \*     \*     \*

For the reasons we have explained, the judgment of the court of appeals is reversed to the extent it allows recovery against Ricardo N., judgment is rendered that Turcios take nothing against Ricardo N., and in all other respects the judgment of the court of appeals is affirmed.