RICARDO N., INC., and F/V
Betty N, Appellants,

v.

Maria Margarita TURCIOS
de ARGUETA, et al.,
Appellees.

No. 13–91–655–CV.

Court of Appeals of Texas,
Corpus Christi.

Dec. 16, 1993.

Rearing Overruled Jan. 20, 1994.

Christa L. Brown, Austin, G. Don Schauer, Pipitone, Schauer & Simank, Cynthia Satel Allison, Seger & Allison, Daniel D. Pipitone, Pipitone, Schauer & Simank, Corpus Christi, for appellants.

Richard C. Arroyo, Brownsville, Eli C. Salinas, Corpus Christi, for appellees.

Before GILBERTO HINOJOSA, PAUL W. NYE,[1] and FEDERICO G. HINOJOSA, Jr., JJ.

1. Former Chief Justice, retired April 30, 1993.

## OPINION

GILBERTO HINOJOSA, Justice.

Juan Luis Argueta was a header on the F/V "Betty N," a shrimping vessel owned by Ricardo N., Inc. He was lost at sea approximately eighty miles from shore and is presumed dead. On May 9, 1986, Maria Margarita Turcios de Argueta, individually and as administratrix of her deceased husband's estate, and as guardian of the persons and estates of Xiomaria Margarita Argueta, Maria de los Angeles Argueta, Jorge Samuel Argueta, and Maria Aidee, minors ("appellees"), sued Ricardo N., Inc., and the F/V "Betty N" ("appellants"). Appellees brought suit in state district court under the Jones Act and the Death on the High Seas Act. In October 1987, appellants removed the cause to federal court, where it remained until July 1991. On remand, the case was tried before the state trial judge on August 22, 1991. The trial court ruled for appellees and awarded $100,000 to Maria de Argueta and $50,000 to each of the four minor children, as well as $200,000 in exemplary damages, and prejudgment and postjudgment interest. Appellants challenge the trial court's judgment by 15 points of error. We reverse in part and affirm the remainder of the judgment.

## PROCEDURAL FACTS

Appellants bring several points of error challenging the trial court's procedural rulings. The complexity of some of the related procedural issues necessitates a somewhat detailed description of the procedural facts.

This case was set for trial on the jury docket for October 19, 1987. The parties appeared before the trial court for announcements on October 16, 1987. Appellees announced "ready ... on the nonjury docket." Counsel for appellants was not present to announce "ready," but because counsel was nearby, the trial judge marked appellants ready on the trial docket. Shortly thereafter, counsel for appellants arrived and announced that they had just learned that appellees "had not requested a jury." Consequently, appellants immediately requested a jury trial and tendered the jury fee. At this time, counsel for appellees stated, "If we had made a request for a jury, we're withdrawing that request." Because the jury fee had not been paid, and because the trial court already had several jury trials scheduled, the trial judge announced that at that point in time the case was to proceed as a bench trial.

When the parties appeared on October 19, 1987, appellees announced "ready," and appellants announced "ready for jury selection." The trial judge responded that appellants would not get a jury trial because the jury fee was not timely paid and because a jury panel was not available due to the scheduling of four other jury trials. Appellants made an offer of proof in which they called the district clerk to testify that the court could accommodate appellants' request for a jury trial. When the trial judge reiterated that he would deny appellants' request for a jury trial because it would be too "burdensome," appellants requested permission to take up one other matter, and proceeded to invite opposing counsel to "stipulate limitation of liability under the Jones Act."[2] Once it was established that appel-

---

**2.** Federal courts have "exclusive cognizance" of "contested" limitation of liability questions. *Vatican Shrimp, Inc. v. Solis*, 820 F.2d 674, 678 (5th Cir.1987) (citing *Langnes v. Green*, 282 U.S. 531, 543, 51 S.Ct. 243, 247, 75 L.Ed. 520 (1931)). The following discussion of "limitation of liability" occurred in the October 19, 1987, hearing:

> Appellants: Your Honor, could I take up one other matter?
> Court: Sure.
> Appellants: It just will take a moment. We invite counsel to stipulate with us that the limitation of liability proceedings apply and that you will not contend that this defendant is *not entitled* to limitation of liability proceeding [sic] as provided in U.S.C. 1, Section

123; U.S.Code 183. We invite his stipulation that we are *entitled to limitation of* liability.

> Appellees: Your Honor, we can't stipulate to that.

\* \* \* \* \* \*

> Court: He's not stipulating to it at this point in time.
> Appellees: Can I invite you to admit liability?

\* \* \* \* \* \*

> Appellants: I just wish to be clear that it's his position that he's contesting our ability to limit liability under the statute, Your Honor.
> Court: I believe that's what he's told the Court already.

lees would not stipulate limitation of liability, the trial judge set the case for trial October 22, 1987.

On October 21, 1987, appellants filed a petition for removal to federal court pursuant to 46 U.S.C.App. § 183 and filed a petition in federal district court pursuant to 46 U.S.C.App. § 185. The cause languished for four years in federal court before the petition was dismissed and the cause was remanded on July 11, 1991. During those four years, counsel for appellants was substituted.

In the hearing on appellee's motion for remand on July 11, 1991, the federal district judge determined that FED.R.CIV.P. 11 sanctions were not appropriate, stating that "there was a good faith effort and reliance on the part of previous counsel in this case with regards to some language in *Vatican Shrimp* concerning proper removal, albeit misplaced on their part." After the case was remanded to the state court, the state trial judge concluded that appellants had removed the case solely for purposes of delay. In a hearing on August 9, 1991, the trial judge stated, "if I remember this case correctly, the lawyers representing the defendants ... filed removal because they wanted a jury trial and I wouldn't give it to them. That's the only reason they filed a removal.... I think that they were doing it for that particular—for that purpose only, and not for any other purpose."

Having concluded that counsel for appellant removed solely for purposes of delay, the trial court ordered that the case would be tried "as it stood on October 22, 1987." On August 14, 1991, the state trial judge drafted and mailed a letter which stated:

> The Court has reviewed all motions and the Court will order the case be tried as it stood on October 22, 1987. The docket sheet reflects the reasons for my ruling. I enclose a copy of the docket sheet.
>
> I will try this case next week and most likely on Thursday, August 22, 1991 at 10:00 .a.m. My office will let you both know for sure on Monday, August 19, 1991.

Appellees: Well, I'm not willing to stipulate to it. I think it's their burden to show it, but

The docket sheet reflects that the reasons for the trial court's ruling were 1) the court had too many juries to select and, 2) appellants' request for a jury trial was untimely.

Throughout trial, the court ruled against appellants consistent with its proclamation that the parties would try the case "as it stood" in 1987. The judge disallowed the testimony of three defense witnesses who appellants did not designate before October 22, 1987; the judge refused to grant appellants' request for a trial amendment to plead that Maria was not Argueta's wife, and also prohibited cross examination to determine her status as the children's representative; he denied appellants' requests to engage in further discovery, denied appellants' motion for continuance, and refused to deem as admitted requests for admission which appellants filed in federal court; and, the trial judge denied appellants' renewed requests for a jury trial.

## DENIAL OF A JURY TRIAL

Appellants bring five procedural points of error which challenge these "back to the past" procedural rulings. In their first point of error, appellants challenge the court's refusal to grant a jury trial in 1987 and in 1991. This point of error involves three separate issues.

■ The first issue to resolve is whether the trial judge correctly denied appellants' request for a jury trial in October 1987. Before addressing the merits of appellants' claims, we question whether appellants, by engaging in sanctionable conduct, have waived their right to complain of the 1987 denial of a jury trial. Had appellants submitted to the trial court's denial of their request for a jury trial, tried the case to the bench, and then raised the issue on appeal, appellants' right to complain of the denial of their jury request undoubtedly would have remained intact. However, appellants did not even attempt to file a motion for continuance. Instead, they immediately launched into the limitation of liability issue, which could only be resolved by the federal court,

that's something we'll get into at trial.

even though they could have removed at any time over the prior year and four months. We agree with the state trial court's conclusion that appellants' decision to remove was a blatant attempt to side step the court's denial of a jury trial. Because appellants' dilatory tactics have caused such judicial inefficiency, their unclean hands should work as a waiver of their right to complain of the trial court's refusal to grant a jury trial in 1987.

■ Regardless of the equitable propriety of appellants' pretrial conduct in 1987, appellants' claim that the trial court wrongfully denied their request for a jury trial in 1987 fails on the legal merits. The right of trial by jury and the manner in which this right may be secured are set forth in article I, § 15 and article V, § 10 of the Texas Constitution, and Rule 216 of the Texas Rules of Civil Procedure.[3] Two affirmative acts are required. A demand for a jury trial must be made and a jury fee must be deposited with the clerk. TEX.R.CIV.P. 216. A party desiring a jury trial must file the request and pay the jury fee at least thirty days prior to the date set for trial. *Id.* In the absence of compliance with Rule 216, whether to grant a jury trial is discretionary with the trial judge. *Dawson v. Jarvis*, 627 S.W.2d 444, 446 (Tex. App.—Houston [1st Dist.] 1981, writ ref'd n.r.e.).

■ Appellants in this case untimely requested a jury trial and paid the jury fee less than thirty days before trial on October 16, 1987. Accordingly, the trial judge had the discretion to deny appellants' request. *Dawson*, 627 S.W.2d at 446.

■ To show that a trial court has abused its discretion in denying a request for a jury

trial, the complaining party must establish that the granting of the late request would not have 1) interfered with the orderly handling of the court's docket, 2) delayed the trial of the case, and 3) operated to the injury of the other party. *Halsell v. Dehoyos*, 810 S.W.2d 371, 371 (Tex.1991). Cases in which trial courts have been held to have abused their discretion in denying jury trials involve situations in which both parties clearly indicated they wanted trial by jury, the trial had been set on the jury docket, and jury panels were available, yet payment of the jury fee was inadvertently overlooked. *See Dawson*, 627 S.W.2d at 447; *Arnoff v. Texas Turnpike Auth.*, 299 S.W.2d 342, 344 (Tex.Civ.App.—Dallas 1957, no writ).

As the complaining party, appellants had the burden to prove that the trial court abused its discretion in denying their request for a jury trial. In their bill of exception, appellants elicited testimony from the district clerk that to provide sufficient veniremen would have required approximately one-half hour. However, the trial judge personally elicited testimony from the clerk that selecting a jury would require the parties to remain until late that night. The trial judge opined that selecting a jury would have been burdensome and would have interfered with the orderly handling of the court's docket.

More importantly, appellants offered no evidence that the granting of their request for a jury trial would not injure appellees. Unlike *Arnoff* and *Dawson*, cases in which *both* parties wanted a jury trial, in this case, only appellants wanted a jury trial. Appellants were apparently alone in operating under the assumption that trial was to be to a

---

3. **Article I, § 15. Right of trial by jury**

Sec. 15. The right of trial by jury shall remain inviolate. The Legislature shall pass such laws as may be needed to regulate the same, and to maintain its purity and efficiency....

**Article V, § 10. Trial by jury**

Sec. 10. In the trial of all causes in the District Courts, the plaintiff or defendant shall, upon application made in open court, have the right of trial by jury; but no jury shall be empaneled in any civil case unless demanded by a party to the case, and a jury fee be paid by the party demanding a jury, for such sum, and with such exceptions as may be prescribed by the Legislature. TEX.CONST. art. V, § 10 (1955).

**Rule 216. Request and Fee for Jury Trial**

a. **Request.** No jury trial shall be had in any civil suit, unless a written request for a jury trial is filed with the clerk of the court a reasonable time before the date set for trial of the cause on the non-jury docket, but not less than thirty days in advance.

b. **Jury Fee.** Unless otherwise provided by law, a fee of ten dollars if in the district court and five dollars if in the county court must be deposited with the clerk of the court within the time for making a written request for a jury trial. The clerk shall promptly enter a notation of the payment of such fee upon the court's docket sheet.

jury. Moreover, no other indicia of an impending jury trial existed, such as motions in limine. Appellees affirmatively stated in the October 16, 1987, hearing that they wanted a trial to the bench and waived any prior requests for a jury trial that they may have made. Unlike *Arnoff* and *Dawson*, the record does not indicate that appellees inadvertently failed to pay the jury fee.

Appellants failed to meet their burden of showing that the trial court abused its discretion in denying their initial request for a jury trial. They have failed to prove that granting the jury trial would not have operated to the injury of appellees, and would not have interfered with the orderly handling of the court's docket. *Halsell*, 810 S.W.2d at 371; *Dawson*, 627 S.W.2d at 446–47. Accordingly, we hold that the trial court did not abuse its discretion when it denied appellants' request for a jury trial in October of 1987.

### Whether the 1987 Request was Timely in 1991

■ Turning to the 1991 trial, appellants offer two arguments favoring the proposition that the trial court erred in denying their request for a jury trial. First, citing *Halsell*, 810 S.W.2d 371, they argue that their untimely 1987 request for a jury trial was made timely by the four-year hiatus in federal court. In *Halsell*, a defendant's untimely request for a jury trial became timely after a new trial setting was scheduled almost sixty days after the defendant's untimely request. The holding in *Halsell* was applied in *Whiteford v. Baugher*, 818 S.W.2d 423 (Tex.App.— Houston [1st Dist.] 1991, writ denied), where a defendant's untimely jury demand was made timely because the defendant had paid his jury fee and filed his jury request more than thirty days before the day the case *actually* went to trial.

However, *Halsell* and *Whiteford* are distinguishable from this case. In those cases, the trial court set the new trial dates. Nothing indicates that the party complaining of the denial of a request for a jury trial brought about the delay which resulted in the new trial settings. Comparatively, in this case, appellants unilaterally gained a four-year "continuance" by filing a petition for removal.

Moreover, the good faith of the complaining party was not an issue in *Halsell* and *Whiteford*. Yet, in this case, the trial court concluded that appellants filed for removal solely as a dilatory tactic. We hold that *Halsell* and *Whiteford* are not applicable to the facts of this case and that appellants' untimely request for a jury trial in 1987 did not become timely on remand in 1991.

### Denial of 1991 Jury Request

Appellants' second argument to support their contention that the trial court wrongfully refused to grant them a jury trial in 1991 is that their timely request for a jury trial and payment of a jury fee in 1991 preserved their right to a jury trial. Having concluded that appellants removed solely as a dilatory tactic, the trial judge on remand sanctioned appellants by ordering that the case go to trial "as it stood on October 22, 1987." On that date, the trial judge had denied appellants' untimely request for a jury trial. Thus, an incidental effect of the trial court's sanction to try the case "as it stood" was that appellants' jury request in 1991, even if timely, was ineffective.

### The State Trial Court's Inherent Power to Sanction

The determinative issue in responding to appellants' argument is whether a state district judge, having concluded that a party removed to federal court solely for purposes of delay, has the authority to sanction such a party in light of a federal district judge's determination that FED.R.CIV.P. 11 sanctions are inappropriate. We believe the answer lies in the trial court's inherent power to sanction.

■ Texas courts have inherent judicial power which they may call upon to aid in the preservation of their independence and integrity. *Public Util. Comm'n of Texas v. Coffer*, 754 S.W.2d 121, 124 (Tex.1988). This inherent judicial power encompasses the inherent power to sanction for abuse of the judicial process that may not be covered by rule or statute. *Kutch v. Del Mar College*, 831 S.W.2d 506, 510 (Tex.App.—Corpus Christi 1992, no writ). Inherent power to

sanction exists to the extent necessary to deter, alleviate, and counteract bad faith abuse of the judicial process. *Id.*

Accordingly, our analysis of whether the trial court appropriately exercised its inherent power to sanction requires that we first determine whether appellants' filing of a petition for removal constituted a bad faith abuse of the judicial process. Although filing a petition for removal to federal court is normally an acceptable trial strategy, it is no secret that some such petitions are filed as a dilatory tactic. The following discussion illustrates that, by combining the timing of appellants' petition with our conclusion that appellants must have known that the federal court would deny their petition for removal, the obvious conclusion is that appellants' removal constituted a bad faith abuse of the judicial process.

Appellants filed their petition for removal under the Limitation of Liability Act of 1851, 46 U.S.C.App. §§ 181–96 (1982). Under this Act, a vessel owner can restrict its liability to the value of the vessel and its freight when it has "set up" the defense of limitation of liability through one of two procedural methods. The first method is to file a § 185 petition in federal district court. *Vatican Shrimp Co., Inc.,* 820 F.2d at 677. A vessel owner filing a § 185 petition also must post bond or transfer its interest in the vessel to cause the claims against the owner with respect to the matter in question to cease. 46 U.S.C.App. § 185. Because shipowners could delay filing a § 185 petition in federal court until the eve of a state court trial, in 1936 Congress amended § 185 to impose a six month statute of limitations on the filing of a § 185 petition. *Vatican Shrimp Co., Inc.,* 820 F.2d at 682 (on motion for rehearing). In spite of the potential hardships suffered by small vessel owners, the Fifth Circuit has upheld the requirement that the shipowner file its petition in federal court within six months of receiving "written notice

of claim." *Id.* at 681–682 (on motion for rehearing). Section 183 of the Act contains the second method by which a vessel owner may limit liability. A shipowner "sets up" limitations as a defense by pleading the general provisions of § 183 in any court, including state court. *Id.* at 677. Once the shipowner's right to limit liability is "contested," only a federal court may exercise jurisdiction because the cause becomes cognizable only in admiralty.[4] *Id.* (citing *Langnes v. Green,* 282 U.S. 531, 51 S.Ct. 243, 75 L.Ed. 520 (1931) and *Ex Parte Green,* 286 U.S. 437, 52 S.Ct. 602, 76 L.Ed. 1212 (1932)).

In *Vatican Shrimp Co., Inc. v. Solis,* in which original counsel for appellants was counsel of record, and in which the same federal district judge presided, the Fifth Circuit held that the § 183 removal procedure prescribed in *Langnes* was modified by the six month statute of limitations added to § 185 after *Langnes* and *Green* were decided. The Fifth Circuit stated, "if a shipowner is sued in state court, the owner's failure to file a section 185 petition in federal district court within six months after receiving written notice of the claim will result in forfeiture of the right to limit liability should the claimant contest the limitation defense." *Vatican Shrimp Co., Inc.,* 820 F.2d at 678. The court continued, "[O]nce written notice of a claim is received, unless that notice is a complaint filed in federal court, the prudent shipowner would file a timely section 185 petition in district court and move to stay the federal proceedings on the limitations petition until such time as limited liability is contested." *Id.* at 678–79. Accordingly, if nothing else in *Vatican Shrimp Co., Inc.* is clear, it is crystal clear that *Vatican Shrimp Co., Inc.* requires that a ship owner attempting to limit its liability by removing to federal court pursuant to § 183 absolutely must have had a § 185 petition on file in federal court within six months of the time the vessel owner received written notice of a claim.

---

4. We note that the federal court in *Vatican Shrimp Co., Inc.* expressly declined to resolve the issue of exactly when limitation of liability becomes "contested." *Id.* at 679. While, logically, it may seem that limitation of liability becomes "contested" when a vessel owner receives written notice of a claim in excess of the value of the

vessel, the federal court in this case found that appellants received written notice of a claim no later than the time at which pleadings were filed, and also expressly held that limitation of liability became "contested" in the hearing two days before appellants filed their petition for removal.

In this case, counsel for appellants filed their § 185 petition in district court at the same time they filed their § 183 petition for removal. In *Vatican Shrimp Co., Inc.*, the federal judge dismissed counsel's § 185 petition as untimely because it was filed one and one-half years after the case was filed in state court. Therefore, it should have come as no surprise to appellants when the same federal judge likewise dismissed appellants' § 185 petition as untimely, since appellants filed this § 185 petition one year and four months after the case was filed in state court. Similarly, in both this case and *Vatican Shrimp Co., Inc.*, the federal judge remanded appellants' § 183 petition under 28 U.S.C. § 1447(c) because the expiration of the six-month statute of limitations imposed by § 185 left it with no jurisdiction to hear the contested limitation of liability issue. The facts of this case were on all-fours with *Vatican Shrimp Co., Inc.*, and so original counsel for appellants must have known the inevitable outcome of their § 183 petition for removal. If original counsel for appellants had any legitimate interest in removing this case to federal court for a determination of the limitation of liability issue, borrowing on their first-hand experience in *Vatican Shrimp Co., Inc.*, they would have filed the § 185 petition before the day following the state trial judge's denial of their request for a jury trial.

In determining whether appellants' conduct constituted a bad faith abuse of the judicial process, we cannot ignore the federal court's finding that appellants' petition for removal was based on a "good faith effort" to rely on language in *Vatican Shrimp Co., Inc.* However, with respect to issuing sanctions for dilatory behavior such as the kind at issue here, we believe that deference should be given to the state judge's observations. The state judge, unlike the federal judge, had the opportunity to observe appellants' conduct and demeanor for a year and four months while the parties prepared for the 1987 trial setting. The state judge was in a better position to make an informed determi-

nation of whether appellants were acting in good faith when they filed their last-minute petition for removal. From this superior vantage point, the state judge concluded that appellants filed their petition for removal solely for purposes of delay when they learned that they would be denied a jury trial.

Within the context of the clear mandate of *Vatican Shrimp Co., Inc.*, the timing of appellants' petition for removal is, at a minimum, suspect. Original counsel for appellants on October 19, 1987, was clearly attempting to induce appellees to "contest" limitation of liability to lend legitimacy to their § 183 petition for removal. *See* fn. 1, *supra.* Knowing that a timely § 185 petition had not been filed, inducing appellees to "contest" limitation of liability was nothing but a charade to side step the trial court's denial of their request for a jury trial.

Giving deference to the state trial judge's finding that appellants removed as a dilatory tactic, and noting the suspect timing of appellants' removal within the context of the clear mandate of *Vatican Shrimp Co., Inc.*, we hold that the state trial court had the inherent power to issue sanctions.[5] *Coffer,* 754 S.W.2d at 124; *Kutch,* 831 S.W.2d at 510.

### Abuse of Discretion in Denying Jury Request

■ Having concluded that the state district judge had the inherent authority to sanction appellants, we must now determine whether the trial court correctly denied appellants' request for a jury trial in 1991 when appellants demanded a jury trial and paid the jury fee more than thirty days prior to trial. To determine whether the state trial court abused its discretion in exercising its inherent powers to impose sanctions, appellate courts make an independent inquiry of the entire record, *Chrysler Corp. v. Blackmon,* 841 S.W.2d 844, 852 (Tex.1992); *Kutch,* 831 S.W.2d at 512, and apply the factors enunciated in *Transamerican Natural Gas v. Powell,* 811 S.W.2d 913, 917 (Tex.1991).

---

**5.** This case is distinguishable from *General Electric Co. v. Salinas,* 861 S.W.2d 20 (Tex.App.—Corpus Christi 1993) in which this Court held that the trial court erred in arbitrarily freezing discovery at the time of the initial trial setting. In *Salinas,* it was undisputed that the trial court's order to freeze discovery was not a sanctions order.

Under *Transamerican*, whether the imposition of sanctions is just depends on whether a direct relationship exists between the offensive conduct and the sanction imposed and on whether the sanction is excessive, in that the punishment must fit the crime. *Id.* at 917. As a reviewing court, we look to whether the sanction is directed against the abuse and operates to remedy the prejudice caused the innocent party. We also ensure that the sanction is no more severe than necessary to satisfy its legitimate purposes.[6]

Ordering that the case be tried "as it stood" was a sanction directly related to appellants' bad faith abuse of the judicial process. Trying the case "as it stood" did not permit appellants to side step the trial court's ruling. To the extent possible, it remedied any prejudice the four-year delay caused appellees by "freezing" trial posture as it existed in 1987. Appellees did not want a jury trial in 1987, and appellants, as discussed above, failed to show that granting a jury trial would not have harmed appellees. Ordering that the case be tried "as it stood" maintained the status quo. Finally, the sanctions were imposed upon appellants, who filed the petition for removal.[7]

Refusing to grant appellants' timely request for a jury trial in 1991 was not excessive. This is not a death penalty sanctions case. The state judge did not strike appellants' pleadings or render a directed verdict on the issue of liability. He merely ordered that the trial proceed "as it stood on October 22, 1987." Since appellants announced "ready" in 1987, such a sanction does not strike this Court as excessive.

By affirming the trial court's order to try the case "as it stood" we do not wish to detract from this State's honorable tradition of "jealously guarding" the right to trial by jury. Instead, we emphatically point out the fact that the trial court's sanction was to try the case "as it stood" and that appellant's request for a jury trial was only *incidentally* denied as a result of this sanction. As a reviewing court, we are not intending to condone the denial of a jury trial as a direct sanction against delinquent parties. The incidental denial of appellants' jury request was no more severe than necessary to satisfy its legitimate purpose, which was to prevent appellants from reaping the benefits of their dilatory tactics. Incidentally denying a jury trial was certainly not a "death penalty" sanction. However, although we do not perceive the incidental denial of a jury trial as an excessive sanction, denying a jury trial as a direct sanction might be excessive under the proper circumstances. We hold that the trial court did not abuse its discretion when it incidentally denied appellants' request for a jury trial by ordering that the case be tried "as it stood on October 22, 1987." *Blackmon*, 841 S.W.2d at 852; *Powell*, 811 S.W.2d at 917; *Kutch*, 831 S.W.2d at 512. Appellants' first point of error is overruled.

## MOTION FOR CONTINUANCE

In their second point of error, appellants argue that the trial court abused its discretion in refusing to grant their motion for continuance filed August 7, 1991. Whether to grant a motion for continuance is within the trial court's sound discretion. *Villegas v. Carter*, 711 S.W.2d 624, 626 (Tex.1986). Rule 251 of the Texas Rules of Civil Procedure provides that no continuance shall be granted "except for sufficient cause supported by affidavit." TEX.R.CIV.P. 251. Failure to comply with this requirement creates a rebuttable presumption that the trial court did not abuse its discretion in denying a motion for continuance. *Moffitt v. DSC Finance Corp.*, 797 S.W.2d 661, 663 (Tex.App.—Dallas 1990, writ denied); *Thrower v. Johnston*, 775 S.W.2d 718, 720–21 (Tex.App.—Dallas 1989, no writ).

---

6. Because refusal to grant a request for a jury trial is not a death penalty sanction, we need not address whether appellants' conduct justifies a presumption that their claims or defenses lack merit. *Id.* at 918.

7. In a similar situation, monetary sanctions against the attorney who actually filed for removal may more accurately focus the "sting" of the sanction on the delinquent party. However, because the attorneys for appellants were substituted, the state trial judge was unable to fine the attorney who actually filed for removal.

In their motion for continuance, appellants argued that beginning trial on August 19, 1991, would have unfairly prejudiced them because they had been unable to conduct discovery since October 1987 and had been unable to procure the attendance of witnesses. However, appellants' motion is not verified, nor is it accompanied by any affidavits. Appellants' failure to verify their motion creates a rebuttable presumption that the trial court did not abuse its discretion in denying appellants' motion, and we find no evidence to support the contrary. Appellants' second point of error is overruled.

## DISCOVERY RULINGS AGAINST DEFENDANTS

In their third point of error, appellants complain of several procedural rulings by the trial court. In particular, they argue that the trial court erred in granting the protective orders prohibiting further deposing of witnesses, in refusing to admit the deposition of Jose Solomon Hernandez, in disallowing the testimony of three defense witnesses, and in refusing their request to amend trial pleadings.

We first examine the propriety of the protective order. Appellees filed a motion for protective order on August 2, 1991, asking the trial court to bar appellants from further discovery. Appellees stated that appellants had filed "notices for depositions," and that the trial court should bar appellants from further discovery because appellants had previously announced "ready." At the hearing on the motion for protective order, appellees argued that allowing appellants to redepose the plaintiffs and an expert witness would allow them to take advantage of having wrongfully removed to federal court. Appellees requested the court to proceed exactly from the point at which the parties announced "ready" in October 1987. Appellants countered that the removal was not wrongful and that, since four years had transpired while the case was pending in federal court, additional discovery was warranted. Appellants alleged that they wanted to redepose the plaintiffs because they needed to know what had occurred during the time the case was in federal court.

The trial judge observed that the docket sheet indicated that the parties had appeared in 1987 and announced "ready." Acknowledging that appellants had substituted counsel since 1987, the trial judge stated that the counsel for appellants in 1987 had "filed removal because they wanted a jury trial and I wouldn't give it to them." He then stated that he was inclined to grant the protective order, particularly with respect to witnesses pertaining to liability issues, i.e., expert witnesses, since such issues should have already been thoroughly discovered upon an announcement of "ready." He permitted appellants to brief the issue of whether further discovery with respect to damages would be permissible, i.e., deposing the plaintiffs to update their situation from October 1987. The trial judge answered in the affirmative when counsel for appellants stated, "So the motion for protective order is granted pending a review of any cases I may submit with respect to the plaintiff and the four people I've notice for deposition." Ultimately, the trial court granted appellees' motion for protective order "pertaining to the scheduled depositions of the Plaintiffs."

Discovery is generally permitted into any nonprivileged matter that is relevant and is "reasonably calculated to lead to the discovery of admissible evidence." TEX. R.CIV.P. 166b(2)(a); *Axelson, Inc. v. McIlhany*, 798 S.W.2d 550, 553 (Tex.1990). However, Rule 166b(5) of the Texas Rules of Civil Procedure permits a trial court to "make any order in the interest of justice necessary to protect the movant from undue burden, unnecessary expense, harassment or annoyance, or invasion of personal, constitutional, or property rights ... [including] ... ordering that requested discovery not be sought in whole or in part...." TEX.R.CIV.P. 166b(5)(a). Thus, a trial court has discretion to prohibit discovery on a case by case basis. Furthermore, an announcement of "ready" waives the right to subsequently seek delay based upon facts which are, or with proper diligence should have been, known at the time of announcement, unless an unforeseeable event arises through no fault of the movant. *Reyna v. Reyna*, 738 S.W.2d 772, 775 (Tex.App.—Austin 1987, no writ).

Appellants' announcement of "ready to pick a jury" in October 1987 was sufficient to indicate that they were ready to begin trial.[8] Accordingly, discovery should have been complete at that time. Any unforeseeable events necessitating further discovery were the fault of appellants because appellants wrongfully removed. *See Reyna*, 738 S.W.2d at 775. If appellants had not removed, they would not have needed to redepose the plaintiffs. "In the interest of justice," the trial court precluded further discovery to avoid "unnecessary harassment, annoyance, and invasion of personal rights." TEX.R.CIV.P. 166b(5)(a). We do not find that the trial court abused its discretion in granting appellees' motion for protective order.

We now turn to appellants' next complaint under this point of error, which was that the trial court abused its discretion in refusing to admit the deposition of Jose Solomon Hernandez. Appellants did not designate Hernandez as a witness until August 1, 1991. Moreover, appellants deposed Hernandez after the trial court granted appellees' first protective order. Appellants argue that they thought the first protective order only prohibited deposing appellees. Alternatively, they argue that they had to preserve Hernandez' testimony because he was a fisherman who came to town on August 16 for the Monday, August 19 trial setting, and could not remain in port until the Thursday, August 22 bench setting. The trial court granted appellees' request for a protective order on the grounds that there would be "no further discovery," and, at trial, refused to admit Hernandez' deposition.

Our examination of the record leads us to conclude that the trial court's first protective order precluded any further discovery whatsoever, and not just deposing the appellees, as appellants argue. The discussion in the August 16 hearing indicates that permitting the discovery of appellants' expert (Hernandez) was at issue and denied at the hearing. Appellants should have at least been put on sufficient notice to request leave from the trial court to depose Hernandez. Likewise,

appellants' argument that the Thursday trial setting took them by surprise is without merit. The trial judge indicated in the August 9 hearing that trial "would be any time during" the week of August 19. Moreover, the trial judge's August 14, 1991, letter ordering that the case would go to trial "as it stood" also states, "I will try this case ... most likely on Thursday, August 22...."

Rule 215 permits the trial court to impose sanctions such as an order disallowing further discovery, or an order prohibiting the disobedient party from introducing designated matters into evidence, if the court finds that the party has been abusing the discovery process in seeking discovery. TEX. R.CIV.P. 215(2)(b)(1), 215(2)(b)(4) & 215(3). To determine whether the trial court abused its discretion in imposing discovery sanctions, the reviewing court determines 1) whether a direct relationship exists between the offensive conduct and the sanction imposed, and 2) whether the sanction is excessive. *Powell*, 811 S.W.2d at 917.

We find that the trial court's refusal to admit Hernandez' deposition was directly related to appellants' refusal to comply with the first protective order in that denying the introduction of Hernandez' deposition ensured that appellants would not benefit from abusing the discovery process. *Id.* We also find that refusing to admit the deposition "fit the crime" of refusal to comply with a protective order. *Id.* We hold that the trial court did not abuse its discretion when it refused to admit the Hernandez deposition. TEX. R.CIV.P. 215(4)(c).

Another procedural ruling about which appellants complain is the trial court's disallowance of the trial testimony of three defense witnesses. Two expert witnesses were designated June 21, 1991. The fact witness, Hernandez, was designated August 1, 1991. Consistent with his order to try the case in the posture that existed in October 1987, the trial judge disallowed the witnesses' testimony.

---

**8.** Since one of the items intended to be addressed at that hearing was the determination of whether appellants' request for a jury trial would be granted, we conclude that the conditional nature of appellants' announcement was to avoid a waiver of that issue.

Generally, when a party fails to designate a witness, the party automatically loses the opportunity to offer the witness' testimony, unless the trial court determines that good cause has been shown why the testimony should be allowed. TEX.R.CIV.P. 166b(6), 166b(5), 215(5); *Alvarado v. Farah Mfg. Co., Inc.,* 830 S.W.2d 911, 914 (Tex.1992); *Morrow v. H.E.B., Inc.,* 714 S.W.2d 297, 297–98 (Tex.1986). The automatic exclusion imposed by Rule 215(5) does not apply when a trial is postponed due to nonsuit, nor due to resetting more than thirty days from the date of the original trial date, because the potential prejudice that would have been caused by trial by ambush has been avoided. *Aetna Cas. & Sur. Co. v. Specia,* 849 S.W.2d 805, 807 (Tex.1993); *H.B. Zachry Co. v. Gonzalez,* 847 S.W.2d 246, 246 (Tex.1993); *Alvarado,* 830 S.W.2d at 916 n. 5.

Because appellants wrongfully removed, this case is distinguishable from *Specia* and *Gonzalez.* The state trial court had issued sanctions creating a legal fiction whereby the case was tried "as it stood" in October 1987. This legal fiction was a sanction imposed to minimize the prejudice suffered by appellees due to appellants' wrongful removal, and so the policy justification underlying the exception to the general rule of exclusion imposed by Rule 215(5) is not present. We, therefore, conclude that the exception to the general rule of automatic exclusion pursuant to Rule 215(5) does not apply, and the designation of witnesses for Rule 166b purposes must be measured from October 22, 1987. Because the witnesses were designated within thirty days of October 22, 1987, we hold that the trial court correctly excluded the three witnesses' testimony. TEX.R.CIV.P. 215(5); *Alvarado,* 830 S.W.2d at 914; *Morrow,* 714 S.W.2d at 297–98.

Appellants' final complaint under this point of error is that the trial court denied their request to amend their pleadings. Appellants wished to challenge Maria de Argueta's capacity to bring suit by proving that she was not legally married to Argueta, and that, since 1988, she had effectively abandoned all four of the children on whose behalf she was acting as representative. In denying appellants' request to amend, the trial judge reiterated that the trial would proceed in the posture that existed in October 1987.

When a party objects that proffered evidence does not conform to the pleadings, the trial court shall freely grant a trial amendment to subserve the presentation of the merits of the action, if the objecting party fails to show that such an amendment would cause surprise or prejudice. TEX.R.CIV.P. 66. A trial court may conclude, without a showing of surprise, that an amendment on its face would prejudice an opposing party by reshaping the cause of action. *Greenhalgh v. Service Lloyds Ins. Co.,* 787 S.W.2d 938, 940 (Tex.1990). In *Kirby Forest Industries, Inc. v. Dobbs,* the court held that the trial court did not abuse its discretion when it allowed a party to verify its denial of the existence of a partnership after the parties had rested. *Kirby Forest Industries, Inc. v. Dobbs,* 743 S.W.2d 348, 352 (Tex.App.—Beaumont 1987, writ denied); *see* TEX.R.CIV.P. 93(5). There, the parties completed the entire bench trial as if partnership were properly in issue.

This case is distinguishable from *Kirby* because appellees promptly objected to the introduction of evidence intended to challenge Maria de Argueta's status as a beneficiary and representative. Moreover, challenging Maria's status to bring suit on its face would clearly have reshaped the cause of action and prejudiced appellees, *Greenhalgh,* 787 S.W.2d at 940, because, in 1987, appellants had not challenged Maria's status as a beneficiary or representative. We find that permitting appellants to amend their pleadings and introduce evidence challenging Maria's capacity as a beneficiary or representative would have prejudiced appellees. TEX.R.CIV.P. 66. The trial court did not err in refusing to grant the trial amendment. *Id.*

Having reviewed the trial court's procedural rulings and determined that it did not err, we overrule appellants' third point of error.

## APPELLEES' WITNESS

In their fourth point of error, appellants argue that the trial court erred in permitting appellees to call Greg Goga as a witness

because they failed to timely supplement their designation of persons with knowledge of relevant facts. Greg Goga was the son of Ivo Goga. Ivo was the sole shareholder of Ricardo N., Inc., (which owned the "Betty N") at the time of Argueta's death, but died shortly thereafter. In 1987, appellees had designated "the owner of the vessel 'Betty N'" as a person with knowledge of relevant facts. Greg worked for Ricardo N., Inc., as a "gofer," or assistant, to Ivo at the time of Argueta's death. Because Ivo was deceased, appellees deposed Greg as a representative of Ricardo N., Inc. Not until July 30, 1991, did appellees supplement their response and specifically name Greg Goga as a potential witness. By the time of trial in 1991, Greg was officially the "secretary" of Ricardo N., Inc., but no evidence was offered to show that he was the "owner" of the "Betty N." Appellants argue that the trial court's allowance of Greg Goga's testimony, in the context of the exclusion of appellants' three witnesses, constitutes unequal arbitrary use of the "back to the past" ruling.

In addressing appellants' third point of error, we delineated the law of witness designation, and so we need not discuss the law governing this point of error, except to further add that, even if the trial court abuses its discretion in allowing or disallowing a witness' testimony, we cannot reverse a judgment unless we find that the error "amounted to such a denial of the rights of the appellant as was reasonably calculated to cause and probably did cause the rendition of an improper judgment." *Gee v. Liberty Mut. Fire Ins. Co.*, 765 S.W.2d 394, 396 (Tex.1989); TEX.R.APP.P. 81(b)(1).

Initially, we observe that the trial court's order that the case proceed in the posture that existed in 1987 was a sanction against appellants and not against appellees. Therefore, the trial court's "back to the past" ruling was inapplicable to appellees. However, Greg Goga was not specifically named as a person with knowledge of relevant facts until July 30, 1991, which was not thirty days in advance of the August 22, 1991, trial date. Accordingly, without a showing of good cause, Greg's testimony should have been

excluded. *Alvarado*, 830 S.W.2d at 914; *Morrow*, 714 S.W.2d at 297–98.

We do not, however, reach the question of whether the trial court abused its discretion in permitting Greg Goga's testimony because any error caused by its admission was harmless error. *Gee*, 765 S.W.2d at 396; TEX.R.APP.P. 81(b)(1). Goga skillfully deflected all questions pertaining to training, emergency procedures, investigations, and other subject matters leading to potential liability, by attributing personal knowledge of such subjects to his deceased father. Any remotely harmful testimony examined in the context of the entire record was cumulative and harmless. Appellants' fourth point of error is overruled.

## REQUESTS FOR ADMISSIONS

In their fifth point of error, appellants argue that the state trial court erred in refusing to deem as admitted unanswered requests for admissions which were filed in federal court. On February 21, 1991, after appellees indicated to appellants that they would not cooperate by engaging in further discovery, appellants filed three requests for admissions in federal court. Appellees responded by filing a motion for protective order in federal court on March 12, 1991, arguing that appellants were not entitled to engage in further discovery because they had announced "ready" in 1987 and had wrongfully removed. The federal court never ruled on appellees' motion for protective order before it remanded the case to state court on July 11, 1991.

Appellants argue that, pursuant to FED.R.CIV.P. 36, their requests for admissions should be deemed admitted because appellees' only response was to file a motion for protective order. Appellants cite a federal Massachusetts case for the proposition that the mere filing of a motion requesting a protective order does not automatically stay discovery. *See Goodwin v. City of Boston*, 118 F.R.D. 297, 298 (D.Mass.1988). Appellees respond that, since the federal court never had subject matter jurisdiction, then no actions before it had any force or validity.

This Court is inclined to agree with appellees. Since the federal court dismissed the § 185 petition as untimely and remanded pursuant to 28 U.S.C. § 1447(c) on the grounds that it had no subject matter jurisdiction, then deemed responses to requests for admissions which were filed in federal court should have no force and effect in the state court. Moreover, we find guidance from the federal district court of the southern district of Texas, which held that, during the pendency of a motion to stay the operation of Rule 36, deeming as admitted requests for admissions would be "extremely inequitable and disruptive of judicial proceedings." *Graham v. Three or More Members of the Six Member Army Reserve General Officer Selection Board of 30 November 1979*, 556 F.Supp. 669, 672 (S.D.Tex.1983). There, the federal court held that requests for admissions could not be deemed admitted before a motion to stay the operation of Rule 36 was decided and that, once the case was dismissed from federal court, Rule 36 "could not apply in a cause which was no longer before the District court." *Id.*

█ In this case, appellees filed a motion for protective order which in essence operated as a motion to stay the operation of Rule 36. Since the federal court never ruled on the motion, according to *Graham*, it would be "inequitable" and "disruptive" to deem the requests for admissions as admitted. Furthermore, once the federal court remanded this case to state court, Rule 36 no longer applied. Accordingly, appellant's fifth point of error is overruled.

## THE REST OF THE FACTS

Having addressed appellants' points of error relating to the trial court's procedural rulings, we now turn to an analysis of appellants' other points of error. We begin with a recitation of pertinent facts.

In 1983, Juan Luis Argueta moved from El Salvador to the United States, where he found employment as a shrimper. He lived with his sister, Rosa Candido, in Brownsville, Texas, and worked for approximately four months as a header on the "Betty N." In May 1984, Argueta went overboard in the middle of the night approximately eighty miles from shore and was never found.

The "Betty N" was a commercial shrimping vessel based out of Brownsville, Texas, and owned by Ricardo N., Inc. At the time of Argueta's death, Ivo Goga owned Ricardo N., Inc. Ivo Goga trained the commercial fishermen who worked for Ricardo N., Inc., in proper safety procedures. Ivo Goga investigated Argueta's death, but died shortly thereafter. Consequently, little, if any, evidence was adduced at trial regarding the training received by the crewmembers of the "Betty N" and the results of Ivo Goga's investigation. By the time of trial in August 1991, Greg Goga, Ivo Goga's son, was secretary of Ricardo N., Inc. Although he trained the crewmembers in 1991, Greg Goga testified that he had no knowledge whatsoever regarding the training of crewmembers in 1984 because, at that time, he worked as a "gofer" for his father.

On May 14, 1984, the "Betty N" left the port of Brownsville with four crew members. Argueta and Jose Francisco Arevalo were headers, Sidney Malone was the rigman, and David Acero was the captain. Acero, from Peru, held boat captain's licenses from Peru, Honduras, and Nicaragua. Acero testified by way of deposition and interpreter that Ivo Goga never instructed him in the proper handling of a man-overboard situation. The only instruction and training he had received regarding man-overboard procedures was while he worked in El Salvador. Ivo Goga did provide all crew members with written materials describing proper man-overboard procedures. However, the materials were written in English, and only Malone could read English.

The events leading to Argueta's death were highly contested. Argueta's wife, Maria, testified that at the time of Argueta's death she was en route from El Salvador to the United States with her brother. She testified that until she left El Salvador Argueta had been sending her three to four hundred dollars monthly. She left their four children in El Salvador with her parents, but she and Argueta ultimately intended to bring them to the United States. Maria testified that Argueta was a good swimmer and that

he was not the kind of man to take his own life.

Captain Acero and Rosa Candido gave a different version of the events leading to Argueta's death. Captain Acero and Candido testified by way of deposition and interpreter that Argueta heard reports of his wife's infidelity and, as a result, became increasingly despondent until he committed suicide by jumping off the "Betty N." Candido consulted a lawyer after Argueta's death to try to recover on behalf of Argueta's children, and she also had been receiving financial support from Argueta.

None of the three surviving crew members testified at trial to explain why or how Argueta went overboard. Captain Acero testified by way of deposition that Argueta went overboard at approximately 1:00 a.m. He stated that Argueta appeared normal on the night of the incident and that he did not know that Argueta had suicidal tendencies. He also stated that Argueta got along with the other crewmembers. Captain Acero testified that Malone was the first person to see that Argueta was about to go overboard. According to Acero, Malone said, "'Luis, what are you going to do?' And when he turned, 'boom,' he fell into the water." Later in the deposition, Acero said that he saw Argueta running from the bridge without his shoes on to jump in the water. In response to defense counsel's question, "Was this act of jumping into the water voluntary or involuntary?" Acero replied, "I couldn't tell you whether he was crazy or in his sound mind."

Captain Acero testified that the "Betty N" was equipped with life vests, with a throw ring, and with flares. He stated, however, that no one threw Argueta a floatation device because the crew did not see him after he fell into the water. Instead, when Argueta went overboard, Captain Acero shut down the engines, and the crew began bringing in the rigging. He stated that this process required approximately twenty minutes. After the rigging was in, Captain Acero turned the "Betty N" around to search for Argueta, and Malone began attempting to call the Coast Guard. According to Acero, the "Betty N" had been trawling at approximately two to three miles an hour, the seas were six or seven feet and the wind was fifteen to twenty miles an hour. Captain Acero testified that he had taken a Loran reading to mark the location where Argueta went overboard and that "one more or less knows how far the current can take an object."

The Coast Guard report from the night of the incident indicates that the M/V "Sibbil Gram" reported the incident at approximately 2:50 a.m. The report states that the "M/V 'Sibbil Gram' stated that the M/V 'Ramona Gram' received a call from the vsl. stating she had a man go overboard at 0130." The information relayed to the Coast Guard that night was that Argueta "was wearing underpants only when he fell overboard." It also states that the seas were two to three feet, that the wind was three knots, and that visibility was twenty nautical miles. A subsequent report states that the "M/V 'Sibbil Gram' stated the capt of the F/V 'Betty N' stated subj person stripped down to his under pants (skivvies) and jumped overboard because he wanted off vsl."

The "Betty N" actively searched for Argueta the night he went overboard, and fished in the same area for two more days. The Coast Guard searched for only half a day. Argueta's body was never found and he is presumed dead.

## NEGLIGENCE AND UNSEAWORTHINESS

In their seventh and eighth points of error, appellants challenge the legal and factual sufficiency of the evidence to support any findings of fact or conclusions of law that appellants were negligent or that the "Betty N" was unseaworthy. A judge's findings of fact are reviewable for legal and factual sufficiency of the evidence by the same standards that are applied in reviewing the evidence supporting a jury's answer. *Southern States Transp., Inc. v. Texas,* 774 S.W.2d 639, 640 (Tex.1989). A trial court's conclusions of law may not be challenged for factual sufficiency, but the trial court's conclusions drawn from the facts may be reviewed to determine their correctness. *Mercer v. Bludworth,* 715 S.W.2d 693, 697 (Tex.App.—Houston [1st Dist.] 1986, writ ref'd n.r.e.). When a party challenges the sufficiency of the evidence, the

reviewing court must consider, weigh, and examine all of the evidence that supports and that is contrary to the judge's finding, and set the finding aside only if the evidence standing alone is so weak as to be clearly wrong and manifestly unjust. *Plas–Tex, Inc. v. United States Steel Corp.*, 772 S.W.2d 442, 445 (Tex.1989); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986) (per curiam).

Seamen have alternative remedies against their employers for negligence under the Jones Act, 46 U.S.C.App. § 688 *et seq.*, and for unseaworthiness under the Death on the High Seas Act, 46 U.S.C.App. § 761 *et seq. Smith v. Ithaca Corp.*, 612 F.2d 215, 219–220 (5th Cir.1980); *In re Dearborn Marine Serv., Inc.*, 499 F.2d 263, 270 n. 10 (5th Cir.1974) (citing *Moragne v. States Marine Lines, Inc.*, 398 U.S. 375, 396 n. 12, 90 S.Ct. 1772, 1785 n. 12, 26 L.Ed.2d 339 (1970)).

The Death on the High Seas Act (DOHSA), 46 U.S.C.App. § 761 *et seq.*, provides a remedy for death caused by a "wrongful act, neglect, or default" on the high seas. The Fifth Circuit has construed the language "wrongful act, neglect, or default" to include the warranty of seaworthiness. *See, e.g., Symonette Shipyards, Ltd. v. Clark*, 365 F.2d 464 (5th Cir.1966). Section 7 of DOHSA ensures that state courts have jurisdiction under DOHSA for accidents occurring on nonterritorial waters. *Offshore Logistics, Inc. v. Tallentire*, 477 U.S. 207, 221, 106 S.Ct. 2485, 2493, 91 L.Ed.2d 174 (1986).

▆▆▆ The warranty of seaworthiness imposes on a shipowner the duty to provide seamen with a seaworthy vessel and equipment reasonably fit for its intended use on the vessel. *Mitchell v. Trawler Racer*, 362 U.S. 539, 550, 80 S.Ct. 926, 932, 4 L.Ed.2d 941 (1960). The duty to provide a seaworthy vessel is absolute and nondelegable, *Id.* at 549, 80 S.Ct. at 932, *Downen v. Texas Gulf Shrimp Co.*, 846 S.W.2d 506, 509 (Tex.App.—Corpus Christi 1993, writ denied), *Reviea v. Marine Drilling Co.*, 800 S.W.2d 252, 255 (Tex.App.—Corpus Christi 1990, writ denied), and "is required by a clear recognition of the needs of the seaman for protection from dangerous conditions beyond his control," *Waldron v. Moore–McCormack Lines*, 386 U.S. 724, 728, 87 S.Ct. 1410, 1412, 18 L.Ed.2d 482 (1967). Unseaworthiness extends not only to the vessel, but also to the crew. *Waldron*, 386 U.S. at 727, 87 S.Ct. at 1412.

▆▆▆ Negligence is not required for a seaman to recover on an unseaworthiness claim because the claim is not based upon fault. *Downen*, 846 S.W.2d at 509; *Reviea*, 800 S.W.2d at 255. A shipowner can be held liable for latent defects in a vessel, even when the lack of the shipowner's negligence has been stipulated. *See e.g., Chermesino v. Vessel Judith Lee Rose, Inc.*, 211 F.Supp. 36 (U.S.D.Ct.D.Mass.1962), *aff'd*, 317 F.2d 927 (1963). A shipowner's actual or constructive knowledge of a vessel's unseaworthy condition is not essential to the imposition of liability. *Mitchell*, 362 U.S. at 549, 80 S.Ct. at 932. Unseaworthiness is a condition; how the condition arises, whether through negligence or otherwise, is irrelevant to a shipowner's liability. *Aguirre v. Citizens Cas. Co. of N.Y.*, 441 F.2d 141, 143 (5th Cir.1971). The plaintiff has the burden of proving the nature of the vessel's unseaworthiness by a preponderance of the evidence. *Continental Oil Co. v. Lindley*, 382 S.W.2d 296, 300 (Tex. Civ.App.—Houston 1964, writ ref'd n.r.e.).

▆▆▆ In this case, the trial court found that the crew of the "Betty N" was inadequately trained for man-overboard procedures. Captain Acero was asked in his deposition, "Had [Ivo] Goga ever given any instructions to you as to what to do when you lost a man overboard?" to which he replied, "No, none." According to Acero, the only instruction given the crew with respect to man overboard procedures was contained in a manual written entirely in English, which only the rigman, Malone, could read. Neither Arevalo nor Malone testified that they received man overboard training. Greg Goga testified that he was completely ignorant of any of his deceased father's training procedures. Based on the crew's conduct after Argueta went overboard, Coast Guard Commander Pangrass concluded that the crew was inadequately trained in man-overboard procedures. We find that the evidence supporting the trial court's finding that the crew of the "Betty N" was inadequately

trained for man-overboard procedures is not so weak as to be clearly wrong and manifestly unjust. *Plas–Tex, Inc.,* 772 S.W.2d at 445; *Cain,* 709 S.W.2d at 176. Since the crew of the "Betty N" could not be fit for their intended purpose without training in man-overboard procedures, we hold that Ricardo N., Inc., breached its warranty to provide a seaworthy vessel. *See Waldron,* 386 U.S. at 727, 87 S.Ct. at 1411.

■ The trial court also found that the crew of the "Betty N" was not properly trained in the use of the side band radio on board which was necessary for long-range communication. Commander Pangrass testified that the "Betty N" had CB and side band radios on board. According to Pangrass, the side band radio could have reached over two hundred miles in the good weather conditions of May 18, 1984, yet the "Betty N" was unable to reach a twenty-four hour Coast Guard station eighty nautical miles away. Instead, the "Betty N" contacted a nearby fishing vessel which, in turn, contacted the Coast Guard. Captain Acero testified that Malone began trying to radio the Coast Guard approximately twenty minutes after Argueta went overboard. The Coast Guard was reached by the "Sibbil Gram" approximately one hour later. Commander Pangrass testified that it appeared that the crew of the "Betty N" did not know how to work the side band radio, and could only work the CB radio. The trial judge could have inferred from this evidence that, to reach the Coast Guard, Malone used the CB radio to call the "Sibbil Gram" or the "Ramona Gram." This inference is further supported by the Coast Guard report suggesting that the "Sibbil Gram" was only seventeen nautical miles from the "Betty N," which would be within range of a CB radio according to Commander Pangrass. We find that the evidence supporting the trial court's finding that the crew of the "Betty N" was not properly trained to use the side band radio is not so weak as to be clearly wrong and manifestly unjust. *Plas–Tex, Inc.,* 772 S.W.2d at 445; *Cain,* 709 S.W.2d at 176. The failure to provide a crew trained in the use of a side band radio when the vessel fished over eighty miles offshore is a breach of Ricardo N., Inc.'s warranty to provide a seaworthy vessel. *See Waldron,* 386 U.S. at 727, 87 S.Ct. at 1412.

■ We now turn to appellees' negligence claim. A seaman may bring a negligence action against his employer under the Jones Act. 46 U.S.C.App. § 688 *et seq.; Downen,* 846 S.W.2d at 509; *Reviea,* 800 S.W.2d at 254. The seaman need only prove the employer's slight negligence because the Jones Act places a high standard of care on the employer. *Downen,* 846 S.W.2d at 509; *Reviea,* 800 S.W.2d at 254.

■ Liability under the Jones Act extends to breach of the maritime rescue doctrine, which has two components. The "search and rescue" component applies when a seaman "has apparently fallen overboard" but his or her "presence or location in the water is not readily discernable from the ship." *Reyes v. Vantage S.S. Co., Inc.,* 609 F.2d 140, 142 (5th Cir.1980). The leading case in this area is one in which the seaman apparently fell overboard sometime during a five hour time interval, and even his approximate location was unknown by the time his absence was discovered. *Gardner v. Nat'l Bulk Carriers, Inc.,* 310 F.2d 284 (4th Cir. 1962), *cert. denied,* 372 U.S. 913, 83 S.Ct. 728, 9 L.Ed.2d 721 (1963). Citing the captain's failure to even turn around and look for the seaman, the appellate court reversed a take nothing judgment against the widow and remanded for a determination of damages.

■ The second component of the rescue doctrine, which applies when the seaman falls or jumps overboard but remains visible to those on board the ship, imposes an affirmative Jones Act duty upon the ship to use every reasonable means to retrieve the seaman from the water. *Reyes,* 609 F.2d at 142. "This is an expansive duty which derives from the seaman's celebrated status as a 'ward' of the admiralty: 'The contract of employment involves not merely a surrender of the personal liberty of the seaman to a greater extent than is customary, ... but it imposes upon the employer an exceptional obligation to care for the well-being of the crew.' " *Id.* (citing *Harris v. Pennsylvania R.R. Co.,* 50 F.2d 866, 868 (4th Cir.1931)).

The duty to rescue arises the moment the seaman enters the water. *Id.* In *Reyes,* the court held that breach of the duty to rescue was established by the fact that a line-throwing appliance could have been used to deliver a line to a seaman who was visible in the water. *Id.* at 143.

■ Jones Act damages have also been awarded when the violation of a Coast Guard regulation played *any* part in causing an injury. *Kernan v. Amer. Dredging Co.,* 355 U.S. 426, 78 S.Ct. 394, 2 L.Ed.2d 382 (1955); *Reyes,* 609 F.2d at 143; *Neal v. Saga Shipping Co.,* 407 F.2d 481 (5th Cir.1969). Under the Jones Act, liability for the violation of a statute is not limited to situations in which the statute was intended to protect those in the position of the plaintiff from the type of injury that in fact incurred. *Kernan,* 355 U.S. at 438, 78 S.Ct. at 401. This high standard of care imposed by the Jones Act stems from the practice under the Federal Employers' Liability Act of equitably shifting between the employee and the employer the risks inherent in the railroad industry. *Id.* "Where the employer's conduct falls short of the high standard required of him by [FELA], and his fault, in whole or in part, causes injury, liability ensues." *Id.* at 438–39. Since FELA is incorporated into the Jones Act, the United States Supreme Court has applied this high standard of care in Jones Act cases. *Id.* at 439. In *Reyes,* the court held that the lack of a rocket powered line-throwing appliance required by Coast Guard regulations, combined with the shipowner's duty to rescue, established the shipowner's negligence as a matter of law. *Reyes,* 609 F.2d at 143.

■ In this case, the trial court found that the crew of the "Betty N" failed to throw any sort of life-preserver or floatation device to Argueta and failed to mark the location of Argueta's entrance into the water. Even though Captain Acero testified that the crew lost sight of Argueta the moment he went overboard, we still apply the second branch of the rescue doctrine to these facts because the crew knew the moment Argueta went overboard and his general position and location in the water. *Reyes,* 609 F.2d at 142. Thus, the ship had the duty to use every reasonable means to retrieve Argueta from the water, and the duty arose the moment Argueta entered the water. *Id.*

The "Betty N" was equipped with a life ring, life vests, and flares, and yet the evidence is undisputed that no one tossed a floatation or illumination device in Argueta's general direction. Commander Pangrass testified that it was common man-overboard procedure to toss such an object to facilitate locating a person in the water. We find that the evidence supporting the trial court's findings is not so weak as to be clearly wrong and manifestly unjust. *Plas–Tex, Inc.,* 772 S.W.2d at 445; *Cain,* 709 S.W.2d at 176. We hold that this evidence constitutes a breach of the duty to use every reasonable means to retrieve Argueta from the water. *Reyes,* 609 F.2d at 142.

■ The trial court also found that appellants did not have life vests with lights attached as required by 46 C.F.R. § 25.25–13, leading the trial court to conclude that appellants were negligent as a matter of law. Initially, we observe that appellants not only brought no witnesses to trial who could testify that the "Betty N" was equipped with life vests with lights on them, they also did not bring the life vests which were on the "Betty N" to show that they were Coast Guard approved. Accordingly, like the trial judge, we are relegated to reviewing Captain Acero's deposition and the Coast Guard reports which were admitted at trial.

Whether the "Betty N" had any life vests on board, with or without lights, is questionable. On the Coast Guard report describing the "Betty N" and the incident with Argueta, the statement "SURVIVAL EQUIP: NONE" appears. We have no way of discerning whether that statement refers to the lack of survival equipment carried by Argueta, or the lack of survival equipment on board the "Betty N." However, Captain Acero testified in his deposition that all the crew members had life vests underneath their pillows. We conclude that Captain Acero's testimony is some evidence that the "Betty N" had life vests on board.

Nonetheless, we find no affirmative proof that the life vests on board the "Betty N" did

*not* have lights on them in violation of 46 C.F.R. § 25.25–13. Only Captain Acero testified, and his testimony was vague:

Q. Did you have any floating flashlights on board the boat?

A. No, only the life saving vests have florescent—

[plaintiffs' counsel]: Reflectors, I think.

Acero: Yes, the kind that they look like light when they get wet in the water.

Q. [plaintiffs' counsel] Okay. But, as I understand, one of those was not thrown over.

A. No, the current would take it.

Although Acero's testimony may not prove that the life vests did in fact have lights on them, the testimony does not prove that the life vests did not have lights on them, either. We reverse the trial court's finding that the life vests did not have lights on them because the evidence supporting the finding is so weak as to be clearly wrong and manifestly unjust. *Plas–Tex, Inc.,* 772 S.W.2d at 445; *Cain,* 709 S.W.2d at 176. Accordingly, since appellants have not violated a Coast Guard regulation, we reverse the trial court's finding of negligence as a matter of law. *Reyes,* 609 F.2d at 143.

■ In summary, we hold that the evidence is factually sufficient to support the trial court's findings of negligence and unseaworthiness, but insufficient to support the trial court's finding of negligence as a matter of law. The evidence is, therefore, also legally sufficient to support the trial court's findings of negligence and unseaworthiness. *See Juliette Fowler Homes, Inc. v. Welch Assoc., Inc.,* 793 S.W.2d 660, 666 n. 9 (Tex.1990). Since the trial court did not distinguish the grounds on which it awarded damages, our reversal of the trial court's finding of negligence as a matter of law has no effect on the judgment because the separate negligence and unseaworthiness findings are sufficient to support the trial court's judgment. Appellants' seventh and eighth points of error are overruled.

In their tenth point of error, appellants challenge the factual and legal sufficiency of the evidence supporting the trial court's three findings on causation. The trial court found that 1) it could not "determine from the evidence whether [Argueta] went overboard the Defendant F/V "Betty N" voluntarily or due to foul play;" 2) that Argueta went overboard without wearing a life vest; and 3) that, pursuant to the rescue doctrine as enunciated in *Reyes,* the negligence and unseaworthiness of the "Betty N" were proximate and producing causes of Argueta's death.

■ Only a slight degree of causation is required to succeed under a Jones Act claim. Causation may be found if the shipowner's acts or omissions played any part, no matter how small, in bringing about the death. *Joyce v. Atlantic Richfield Co.,* 651 F.2d 676, 685 (10th Cir.1981). In rescue-type cases brought under the Jones Act, courts have presumed the existence of causation and, in the interest of equity, placed on the shipowner the burden of overcoming the presumption. *Reyes,* 609 F.2d at 145–46. Such a presumption is particularly equitable in rescue-type cases in which a shipowner, charged with the highest degree of diligence to save a man-overboard, claims that sufficient time to commence rescue operations was not available. *Id.* Accordingly, in a Jones Act claim based on failure to implement proper rescue procedures, the shipowner must show that the ship's omissions "could not have been even a *contributing* cause of the seaman's death." *Id.* at 146 (citing *In re Seaboard Shipping Corp.,* 449 F.2d 132, 136 (2d Cir.1971), *cert. denied,* 406 U.S. 949, 92 S.Ct. 2038, 32 L.Ed.2d 337 (1972)). Under DOHSA, a reasonable inference that an unseaworthy vessel was the cause of death will stand. *In re Marine Sulphur Queen,* 460 F.2d 89, 99 (2d Cir.1972).

■ Appellants' only argument that Argueta "caused" his own death is that Argueta jumped into the water to either swim to shore or to commit suicide. The evidence adduced on this issue is conflicting and incomplete. The Coast Guard report indicates that Captain Acero reported that Argueta "jumped overboard because he wanted off [the vessel]," but it does not indicate what prompted him to do so. Captain Acero and Rosa Candido's deposition testimony would suggest that Argueta jumped because he was

despondent about Maria's infidelity. But, Maria testified at trial that she was en route from El Salvador with her brother at the time of Argueta's death. She also stated that Argueta was not the kind of person to take his own life. The trier of fact is entitled to weigh the credibility of the witnesses. *See Lofton v. Texas Brine Corp.*, 777 S.W.2d 384, 387 (Tex.1989).

Even assuming that Argueta jumped overboard voluntarily, Commander Pangrass testified that seamen who voluntarily jump overboard to commit suicide or to swim to shore frequently want back on the vessel once they are in the water. Accordingly, even if Argueta voluntarily jumped, Commander Pangrass' expert testimony suggests that Argueta may have had second thoughts, and would have been as willing to comply with rescue efforts as a man who had accidentally fallen overboard. Since the crew required twenty minutes to turn the "Betty N" around to look for Argueta, tossing a floatation or illumination device into the water could have contributed to Argueta's rescue in many ways. Argueta could have held a life ring or life vest. Anything that floats would have at least marked the location where Argueta entered the water, and compensated somewhat for water currents. The capacity to immediately notify the Coast Guard also could have contributed to Argueta's rescue. Instead, the Coast Guard search could not begin until hours after Argueta went overboard.

The evidence regarding the events that occurred the night that Argueta was lost at sea is so incomplete and tenuous that a precise determination of causation is impossible. Appellants brought none of the crewmembers to trial to explain why or how Argueta went overboard. However, we do know that the crew failed to use every reasonable means of rescue available to them to retrieve Argueta from the water, and we do know that the "Betty N" was unseaworthy. We also know that the incident occurred in May, the Coast Guard reports indicate two to three foot seas, Argueta was a good swimmer, he was not intoxicated, and he was wearing his underwear and so was not weighted by soggy clothes. We do not be-

lieve that the shipowner showed that the negligence of the "Betty N" could not have been a contributing cause of Argueta's death. *Reyes,* 609 F.2d at 145–46. Furthermore, the inference that the unseaworthiness of the "Betty N" caused Argueta's death is not an unreasonable one. *In re Marine Sulphur Queen,* 460 F.2d at 99. We find that the evidence supporting the trial court's finding that appellants' negligence and unseaworthiness caused Argueta's death is not so weak as to be clearly wrong and manifestly unjust. *Plas–Tex, Inc.,* 772 S.W.2d at 445; *Cain,* 709 S.W.2d at 176. Appellants' tenth point of error is overruled.

## JUDGMENT

■ Appellants argue in point of error fifteen that the trial court's amended judgment is void because it was rendered after the court's plenary power had expired. The trial judge signed the first final judgment on September 29, 1991. On November 21, 1991, a hearing was held on appellants' motion for new trial and motion to modify the judgment. At the hearing, the trial judge noted in the docket sheet that the motion for new trial had been denied and that an amended judgment would be submitted. The written, signed order overruling appellants' motion for new trial and motion to modify was dated November 27, 1991. The amended final judgment was signed on December 30, 1991.

The amended final judgment contained a corrected statement of the date of trial, and it added a statement of *in rem* jurisdiction pursuant to the "savings to suitors' clause of 28 U.S.C. § 1333(1)." It also added the statement that all damages were "past pecuniary," which was significant to the extent that, in the trial court's findings of fact, it had found mental anguish, emotional distress, loss of society, loss of affection, and loss of consortium, the recovery of which was questioned by both parties at the time of the hearing.

■ Pursuant to Tex.R.Civ.P. 329b(e), a trial court's plenary power extends for thirty days after the overruling of a motion for new

trial.[9] Once the trial court's plenary power has expired, a clerical error may be corrected by rendering a judgment nunc pro tunc pursuant to Rule 16, and a judgment may be set aside by bill of review for sufficient cause. TEX.R.CIV.P. 329b(f). A "clerical error" is one which does not result from judicial reasoning or determination. *Andrews v. Koch,* 702 S.W.2d 584, 585 (Tex.1986).

Since the trial court overruled appellants' motion for new trial on November 27, 1991, the trial court's plenary power had expired by the time the amended final judgment was signed on December 30, 1991. Thus, the trial court did not have authority to file the amended judgment unless it was a judgment nunc pro tunc. However, the substance of the changes made in the amended judgment indicate that the changes were made as a result of judicial reasoning and not "clerical error." Both the statement of *in rem* jurisdiction and the labelling of damages as "past pecuniary" were disputed legal issues in the November 21, 1991, hearing which gave rise to the amended judgment. Accordingly, we hold that the amended judgment is void, and the first final judgment, signed September 29, 1991, is in effect. Appellants' fifteenth point of error is sustained.

■ In its sixth point of error, appellants argue that the trial court lacked jurisdiction to render judgment against the F/V "Betty N." Under DOHSA, a suit may be brought either *in rem* against the vessel or *in personam* against the owner of the vessel. 46 U.S.C.A.App. § 761. However, the Supreme Court of the United States has held that, although a state court may entertain maritime proceedings *in personam,* a state court may not entertain *in rem* proceedings in which a vessel is treated as an offender and made a defendant. *Madruga v. Superior Court,* 346 U.S. 556, 560, 74 S.Ct. 298, 300, 98 L.Ed. 290 (1954). The federal court's exclusive admiralty jurisdiction over *in rem* proceedings and concurrent admiralty jurisdiction over *in personam* proceedings results from the Court's attempt to reconcile apparently conflicting legislative mandates.[10] *Id.* Accordingly, appellants' sixth point of error is sustained, and the trial court's judgment is modified to delete appellees' recovered damages from the F/V "Betty N." TEX.R.APP.P. 80(b)(2).

## ACTUAL DAMAGES

In point of error eleven, appellants assert that the evidence is legally or factually insufficient to support the trial court's findings of actual damages. The trial court found that appellees were entitled to recover pecuniary losses under the Jones Act and under DOHSA for 1) loss of support, 2) loss of Argueta's services, and 3) loss of nurture, guidance, and counsel, the latter which was limited to the four minor children. In point of error twelve, appellants argue that the trial court erred in awarding damages for nonpecuniary losses. The trial court awarded nonpecuniary damages to appellees under the general maritime law, finding that Maria was entitled to mental anguish, and finding that both Maria and the four children were entitled to loss of society, affection, and consortium. The trial court did not assign a monetary figure to each of these entitlements, nor was he asked to do so by appellants or appellees.

9. **RULE 329b. TIME FOR FILING MOTIONS**

The following rules shall be applicable to motions for new trial and motions to modify, correct, or reform judgments (other than motions to correct the record under Rule 316) in all district and county courts:

\* \* \* \* \* \*

(e) If a motion for new trial is timely filed by any party, the trial court, regardless of whether an appeal has been perfected, has plenary power to grant a new trial or to vacate, modify, correct, or reform the judgment until thirty days after all such timely-filed motions are overruled, either by a written and signed order or by operation of law, whichever occurs first.

10. Article III, § 2, of the United States Constitution and the first Judiciary Act, 28 U.S.C. § 1333, grant federal district courts jurisdiction of all civil cases of "admiralty or maritime jurisdiction." The first Judiciary Act continues, "saving to suitors, in all cases, the right of a common law remedy, where the common law is competent to give it." 28 U.S.C. § 1333(1). This seeming conflict in the "saving to suitors" clause is reconciled with the clause giving federal district courts admiralty and maritime jurisdiction by granting federal district courts exclusive admiralty jurisdiction for maritime proceedings *in rem,* and reserving concurrent jurisdiction with state courts for maritime proceedings *in personam. Madruga,* 346 U.S. at 560, 74 S.Ct. at 300.

Instead, the judgment awards lump sums to Maria in the amount of $100,000, and to the four children in the amount of $50,000 each.

■ Recovery of actual damages under the Jones Act and DOHSA is generally limited to the recovery of pecuniary damages. For instance, in *Miles v. Apex Marine Corp.*, the Supreme Court of the United States held that a claimant could not recover loss of society in a wrongful death action under the Jones Act. *Miles v. Apex Marine Corp.*, 498 U.S. 19, 30, 111 S.Ct. 317, 325, 112 L.Ed.2d 275 (1990). This holding is consistent with the unaltered incorporation of the Federal Employers' Liability Act into the Jones Act. *Id.* Under DOHSA, recovery is limited to pecuniary damages by the explicit text of the Act. DOHSA limits recoverable damages in wrongful death suits to "pecuniary loss sustained by the persons for whose benefits the suit is brought." 46 U.S.C.A.App. § 762. Moreover, in *Mobil Oil Corp. v. Higginbotham,* the Court held that beneficiaries under DOHSA may not supplement their recovery for punitive damages with damages for "loss of society" under general maritime law. *Mobil Oil Corp. v. Higginbotham,* 436 U.S. 618, 625, 98 S.Ct. 2010, 2014, 56 L.Ed.2d 581 (1978); *see also Tallentire,* 477 U.S. at 227, 106 S.Ct. at 2496 (DOHSA preempts conflicting state wrongful death statutes).[11] The Supreme Court of Texas also stated in dicta that nonpecuniary damages such as mental anguish and loss of society are not recoverable under DOHSA. *General Chemical Corp. v. De La Lastra,* 852 S.W.2d 916, 918 (Tex.1993).

■ We hold as a matter of law that the trial court erred in awarding mental anguish to Maria and loss of society to Maria and the children. *Miles,* 498 U.S. at 30, 111 S.Ct. at 325; *Higginbotham,* 436 U.S. at 625, 98 S.Ct. at 2014; *Sea–Land Services, Inc. v. Gaudet,* 414 U.S. 573, 585, fn. 17, 94 S.Ct. 806, 816, fn. 17, 39 L.Ed.2d 9 (1974). Point of error twelve is sustained. However, because the trial court did not assign a particu-

lar portion of the $200,000 in actual damages to each of the elements of damages found, we cannot ascertain with certainty what amount of the actual damages award, if any, was intended to compensate appellees for nonpecuniary losses. *Greater Houston Transp. Co. v. Zrubeck,* 850 S.W.2d 579, 589 (Tex. App.—Corpus Christi 1993, writ denied); *Kansas City So. Ry. Co. v. Carter,* 778 S.W.2d 911, 916 (Tex.App.—Texarkana 1989, writ denied); *see, e.g. De La Lastra,* 852 S.W.2d at 919 (damages award assigned to specific elements of recovery). Accordingly, although we sustain point of error twelve, we do not reverse or order a remittitur.

■ Instead, we continue our analysis of whether the evidence is sufficient to support the trial court's award of pecuniary damages. We first examine the trial court's award of loss of support. Loss of support is universally recognized as a recoverable pecuniary loss. It includes "all the financial contributions that the decedent would have made to his dependents had he lived." *Gaudet,* 414 U.S. at 584–85, 94 S.Ct. at 814–15. Federal courts have imposed on claimants a somewhat draconian calculation of damages for loss of support. *See Culver v. Slater Boat Co.,* 722 F.2d 114, 117 (5th Cir.1983). However, although federal law controls the substantive issues of claims brought under DOHSA and the Jones Act, state courts do not surrender control of procedural issues simply because they have concurrent jurisdiction with federal courts. *Goldston Corp. v. Hernandez,* 714 S.W.2d 350, 352 (Tex. App.—Corpus Christi 1986, writ ref'd n.r.e.). Therefore, appellees' failure to satisfy the tedious federal court requirements is immaterial, and state law controls.

■ The evidence showed that Argueta was twenty-seven years of age, that his work-life expectancy was twenty years, that he was a header on a shrimping vessel, and that the average header on Ricardo N., Inc., vessels earned six to seven thousand dollars annually. Accordingly, the loss of support

---

11. We note, however, that the Fifth Circuit of the United States Court of Appeals has held that a claimant may supplement a DOHSA wrongful death cause of action with a survival cause of action. *Graham v. Milky Way Barge, Inc.,* 811 F.2d 881, 892 (5th Cir.1987). The Jones Act specifically provides for a survival cause of action by its incorporation of the Federal Employers' Liability Act, 45 U.S.C. § 59.

figure would amount to approximately $120,-000 to $140,000.

Another component of the trial court's pecuniary damages award was comprised of loss of services and loss of nurture, guidance and counsel. The United States Supreme Court held in *Sea–Land Services, Inc. v. Gaudet* that children may recover under DOHSA the monetary value of nurture, training, education, and guidance they would have received had the parent not been wrongfully killed. *Sea–Land Services, Inc. v. Gaudet*, 414 U.S. 573, 585, 94 S.Ct. 806, 814, 39 L.Ed.2d 9 (1974). The Court also held that services the decedent performed at home or for his or her spouse were compensable. *Id.*

 Maria testified that, when she lived with Argueta in El Salvador, he performed repairs around their home and kept a garden. Maria also testified that Argueta was a good father who was attentive to his children. This testimony was uncontroverted.

Because the evidence supports an award of damages for loss of support in the amount of. $120,000 to $140,000, then the maximum amount of damages attributable to loss of services and loss of nurture, training, education, and guidance is approximately $60,000 to $80,000. We do not find that the evidence supporting such an award is so weak as to be clearly wrong and manifestly unjust. *Gaudet*, 414 U.S. at 585, 94 S.Ct. at 806; *Plas-Tex, Inc.*, 772 S.W.2d at 445; *Cain*, 709 S.W.2d at 176. Point of error eleven is overruled.

## PUNITIVE DAMAGES

 In point of error fourteen, appellants argue that the trial court erred in awarding punitive damages. The trial court awarded Argueta's estate $200,000 in punitive damages for the wanton and willful misconduct of the crew of the "Betty N" in failing to commence rescue efforts.

Deeming them "nonpecuniary" in nature, courts have held that punitive damages are not recoverable under the Jones Act and DOHSA. *Kopczyknski v. The Jacqueline*, 742 F.2d 555, 560–61 (9th Cir.1984), *cert. denied*, 471 U.S. 1136, 105 S.Ct. 2677, 86 L.Ed.2d 696 (1985); *Haltom v. Lykes Bros. Steamship Co., Inc.*, 771 F.Supp. 179, 181 (E.D.Tex.1991). In *Penrod Drilling Corp. v. Williams*, the Texas Supreme Court applied *Kopczyknski* and *Haltom* for the proposition that punitive damages were not recoverable under either the Jones Act or general maritime law. *Penrod Drilling Corp. v. Williams*, 868 S.W.2d 294, 295 (Tex.1993). The Court has also stated in dicta that a party is precluded from recovering punitive damages under DOHSA because of their nonpecuniary nature. *De La Lastra*, 852 S.W.2d at 918. Point of error fourteen is sustained.

Because we have sustained point of error fourteen, we need not address point of error nine, which challenges the trial court's finding of gross negligence. TEX.R.APP.P. 90(a).

## PREJUDGMENT INTEREST

In point of error thirteen, appellants challenge the trial court's award of prejudgment interest on future damages. The trial court awarded prejudgment and postjudgment interest to appellees at the rate of ten percent per annum.

 In a maritime personal injury case brought under the Jones Act, federal law, not state law, governs the plaintiff's entitlement to prejudgment interest. *Cano v. Gonzalez Trawlers, Inc.*, 809 S.W.2d 238, 239 (Tex.App.—Corpus Christi 1990, no writ). The general rule under the Jones Act is that, if a seaman elects to proceed in federal court under admiralty jurisdiction, he or she can have prejudgment interest but no jury; conversely, if the seaman elects to proceed in a state or federal court under legal jurisdiction, he can ·have a jury but must forego prejudgment interest. *Snyder v. Whittaker Corp.*, 839 F.2d 1085, 1094 (5th Cir.1988). The general rule was applied in *Cano v. Gonzalez Trawlers, Inc.*, 809 S.W.2d at 240, in which this Court held that prejudgment interest was not recoverable under the Jones Act for personal injuries sustained by a seaman. Two policies justify this rule. First, in the typical personal injury suit, the bulk of the damages occur in the future, rendering unjust the imposition of prejudg-

ment interest. *See Wyatt v. Penrod Drilling Co.,* 735 F.2d 951, 955 n. 3 (5th Cir.1984); *Barrios v. Louisiana Constr. Materials Co.,* 465 F.2d 1157, 1168 (5th Cir.1972). Second, calculating prejudgment interest on ongoing damages is difficult for a jury. *Sanford Bros. Boats, Inc. v. Vidrine,* 412 F.2d 958, 973 n. 13 (5th Cir.1969); *Nat'l Airlines, Inc. v. Stiles,* 268 F.2d 400, 406 (5th Cir.), *cert. denied,* 361 U.S. 885, 80 S.Ct. 157, 4 L.Ed.2d 121 (1959).

 However, these policy justifications are inapplicable when the beneficiaries of a deceased seaman bring a Jones Act or DOH-SA wrongful death claim. The Fifth Circuit has indicated that the calculation of prejudgment interest is easier in wrongful death cases because the loss occurs at one time. *Barrios,* 465 F.2d at 1168; *Stiles,* 268 F.2d at 406 n. 6. Furthermore, the Fifth Circuit has held that DOHSA's provision of "fair and just compensation for the pecuniary loss sustained" mandates prejudgment interest in the absence of special circumstances. *Stiles* F.2d at 406. In holding that prejudgment interest was recoverable under DOHSA where the district court awarded ten percent per annum, and where the court itself performed the prejudgment interest calculation, the Fifth Circuit stated:

> We do not believe that the rationale for disallowing prejudgment interest in Jones Act cases brought at law justifies disallowing that interest in DOHSA cases brought at law. Most of the damages in a wrongful death case occur in a moment. Calculation of prejudgment interest from that moment is a relatively easy task.

*Snyder,* 839 F.2d at 1094.

Accordingly, we hold that appellees were entitled to the recovery of prejudgment interest under DOHSA. Furthermore, because this suit is a wrongful death action under the Jones Act, and not a personal injury action, we distinguish this case from *Cano* and hold that appellees were entitled to the recovery of prejudgment interest under the Jones Act. Appellants' thirteenth point of error is overruled.

We REVERSE the trial court's judgment against the F/V "Betty N" and RENDER that appellees take nothing against the F/V "Betty N;" we REVERSE the trial court's award of punitive damages to appellees and RENDER that appellees receive no punitive damages; we declare the trial court's amended judgment VOID and RENDER judgment on the first judgment; the remainder of the judgment is AFFIRMED.

Former Chief Justice PAUL W. NYE not participating.